IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

**ALICIA Y. ALFRED**  :
3032 Bellamy Way  :
Suitland, MD  20746  :
 :
    **Plaintiff,**  :    Civil Case No.: 1:05-cv-01446-PLF
 :
v.  :    JURY DEMAND
 :
**DISTRICT OF COLUMBIA,**  :
441 4th Street, N.W.  :
Washington, DC 20001  :
 :
    **Defendant.**  :
_____ :

## SECOND AMENDED COMPLAINT

1. COMES NOW the Plaintiff, Tech. Sgt. Alicia Y. Alfred, USAF, by and through her counsel, The Law Office of Jimmy A. Bell, P.C., a professional corporation, and Jimmy A. Bell, Esquire, and respectfully presents this complaint against the Defendant, the District of Columbia, a municipal corporation, to enforce her rights under 42 U.S.C. § 1981 for acts of discrimination, and under the Common Law of the District of Columbia for acts of negligence.

## JURISDICTION

2. This action is invoked pursuant to 28 U.S.C. § 1331. Jurisdiction is proper as this action arises under 42 U.S.C. § 1981. This Court has discretion to exercise jurisdiction over the pendent claims of District of Columbia law herein, as these claims arise from a common nucleus of operative fact so that Plaintiff would

1

ordinarily be expected to try them all in one judicial proceeding.  <u>United Mine Workers v. Gibbs</u>, 383 U.S. 715 (1966).

## VENUE

3. Venue is properly laid in the District of Columbia pursuant to 28 U.S.C. § 1391, as the Defendant operates a licensed business in the District of Columbia and the acts herein complained of occurred within the said jurisdiction.

## STATEMENT OF FACTS

4. During all times mentioned in this Complaint, Plaintiff Tech. Sgt. Alicia Y. Alfred, USAF, was, and still is, a citizen of the United States and she resided, and now resides, in the City of Suitland, State of Maryland.

5. During all times mentioned in this Complaint, Plaintiff was on active duty with the United States Armed Forces, serving in the United States Air Force ("USAF") as a Technical Sergeant.

6. During all times mentioned in this Complaint, Defendant, the District of Columbia, was a municipal corporation, charged with overseeing the Metropolitan Police Department of the District of Columbia ("MPD") and its employee, Officer Michael Fanone ("Officer Fanone").

7. On the morning of April 25, 2005 Plaintiff walked out of her home in Suitland, Maryland to find that her car had been stolen during the previous night.

8. Plaintiff promptly called the non-emergency number for the Prince George's County Police Department ("PGCPD") and reported her vehicle stolen.

9. Plaintiff's car is registered with and protected under the LoJack Stolen Vehicle Recovery System ("LoJack").  LoJack, a nationwide vehicle security operation,

        equips clients' cars with transmitters that, upon remote activation after a car has been reported stolen to the police, send out a "stolen vehicle" radio signal to nearby police stations and police cars that are equipped to receive the LoJack transmitter signal.

10. Police department personnel bear the responsibility for changing a vehicle's status to "stolen" after an owner so reports it, and then changing the vehicle's status back to a neutral setting after it has been recovered.

11. Police jurisdictions in the Washington, D.C. metropolitan area have the capability to receive and respond to a LoJack stolen vehicle radio signal, and to update vehicle status in the LoJack system.

12. After Plaintiff made her report to PGCPD, PGCPD properly and correctly updated the status of Plaintiff's car in the LoJack system to reflect its stolen status.

13. On the night of April 25, 2005 an officer of the MPD phoned Plaintiff to tell her that her car had been located in the District of Columbia and that she could recover it at the location where it was found.

14. Plaintiff promptly proceeded to the location given her, arriving about twenty minutes after she received the call.

15. At the recovery site, Plaintiff met and spoke with Officer Fanone.

16. Plaintiff asked Officer Fanone whether she needed to complete any paperwork or make any phone calls to update her car's status in the LoJack system.

17. Officer Fanone assured Plaintiff that she did not need to do anything, and that he would take care of it himself.

18. Plaintiff asked Officer Fanone to explain the procedure he would follow to update her car's status.

19. Officer Fanone explained the procedure to Plaintiff.

20. Plaintiff asked for Officer Fanone's card, so that she could contact him with any further questions.

21. Officer Fanone provided his card to Plaintiff.

22. Officer Fanone then told Plaintiff she was "good to go."

23. Officer Fanone neglected to update the status of Plaintiff's car, so that the car was still identified in the LoJack system as a stolen vehicle.

24. The transmitter in Plaintiff's car continued to send out a "stolen vehicle" radio signal to nearby police stations and patrol cars, because her car was still described in the LoJack system as a stolen vehicle.

25. After leaving the scene of recovery, Plaintiff drove to a Kinko's copy center in the District of Columbia.

26. Shortly after midnight on April 26, 2005 Plaintiff was getting into her car when she was stopped by two MPD officers who asked her about the vehicle because it was still transmitting its "stolen vehicle" signal.

27. Plaintiff identified herself to these MPD officers as the car's owner, and told them that she had reported it stolen the previous day, and had recovered it only a few hours earlier.

28. Plaintiff handed these officers Officer Fanone's card, which they read.

29. These officers said to Plaintiff, "Oh, Officer Fanone. Oh, OK."

30. These MPD officers told her that the car was still transmitting a "stolen vehicle" signal.

31. These MPD officers ran her license tag number through NCIC system and discovered that the NCIC status correctly showed that the car had been found. They informed Plaintiff of this discovery.

32. These MPD officers told Plaintiff it might take a few more minutes for her car to fall out of the LoJack system, and that she should be careful on her way home.

33. Plaintiff drove home. On the way, she stopped for gas at a station where two MPD patrol cars were also being filled. There was no interaction between Plaintiff and any of the officers in charge of these patrol cars.

34. On the morning of April 26, 2005 Plaintiff drove to the place in Arlington, Virginia where she works for the United States Air Force.

35. Plaintiff was appropriately dressed for work in her blue USAF uniform.

36. At 11:15 a.m. on April 26, 2005 Plaintiff, still in uniform, walked out of the building where she works to make a car trip for some lunch.

37. As Plaintiff approached her car, she noticed two Arlington County Police Department ("ACPD") patrol cars in the vicinity of her car.

38. Plaintiff unlocked her car and got in, then dialed a friend on her cell phone.

39. Plaintiff started her car, and began to pull away from her parking space.

40. After Plaintiff had driven approximately fifty feet, and while she was still in front of the office building where she works, Plaintiff noticed one of the ACPD patrol cars pull out into the street in front of her, its siren blaring and lights flashing.

5

41. This ACPD patrol car stopped crosswise in the street, blocking three lanes of traffic and Plaintiff's car.

42. ACPD Officer Mark M. DiGeronimo ("Officer DiGeronimo"), ACPD Badge #1005, got out of this police car with his gun drawn and aimed directly at Plaintiff.

43. Plaintiff was extremely frightened to find herself directly in the line of fire of an apparently loaded gun being brandished by an apparently angry ACPD officer.

44. Using his patrol car's loudspeaker, Officer DiGeronimo screamed at Plaintiff to get out of her car with her hands up. Plaintiff's coworkers on the twelfth floor of the office building where she works heard Officer DiGeronimo's order clearly from the street below.

45. Plaintiff dropped her cell phone and got out of her car, keeping her hands in the air and clearly visible to Officer DiGeronimo at all times.

46. At this time, Plaintiff noticed that a second ACPD car had pulled up behind Plaintiff's car, with its siren blaring and lights flashing. Officer Robert Giambrone ("Officer Giambrone"), ACPD Badge #660, had emerged from this car and, to assist Officer DiGeronimo, had approached Plaintiff from the rear and was now also pointing his drawn and presumably loaded weapon directly at Plaintiff in an angry and threatening manner and shouting for her to put her hands on the car.

47. Plaintiff immediately informed Officer DiGeronimo that she had reported her car stolen the day before and recovered it the previous night.

6

48. Officer DiGeronimo and Officer Giambrone shouted at Plaintiff to put her hands on the car.

49. Plaintiff put her hands on the car.

50. Officer DiGeronimo and Officer Giambrone then shouted at Plaintiff to move away from the car.

51. Plaintiff began to move away from the car, but Officer DiGeronimo and Officer Giambrone again shouted at her to put her hands on the car.

52. Plaintiff again put her hands on the car.

53. Officer DiGeronimo and Officer Giambrone told Plaintiff to spread her legs out.

54. Plaintiff spread her legs out while keeping her hands on the car.

55. Plaintiff again tried to explain the theft and recovery incidents of the previous day to Officer DiGeronimo and Officer Giambrone, and that she was the car's registered owner.

56. Officer DiGeronimo then told Officer Giambrone to handcuff Plaintiff.

57. At approximately 11:20 a.m., Officer Giambrone handcuffed Plaintiff while she was in her blue military uniform, and in full view of people who work with her in her office building.

58. Plaintiff once again tried to reason with Officer DiGeronimo and Officer Giambrone, telling them again that she was the car's owner, that she herself had reported it stolen, that the MPD had found it the night before, that she had the card of Officer Fanone, who had found the car, and that her ID was there and that they could match it with her registration documents.

59. Officer DiGeronimo began to rummage through Plaintiff's car and bags to find her ID and registration.

60. Officer Giambrone removed Plaintiff's Pentagon ID badge from her USAF uniform.

61. Plaintiff informed Officer Giambrone that her coworkers and supervisors were now gathered on the sidewalk, watching her ordeal.

62. Officer Giambrone asked where they were.

63. Plaintiff indicated where on the sidewalk her coworkers and supervisors were standing.

64. Plaintiff attempted to explain to Officer DiGeronimo where in her vehicle he could find her ID and registration, because he was looking in the wrong place, and so that he might not have to completely ransack Plaintiff's car.

65. Officer DiGeronimo and Officer Giambrone again vehemently requested Plaintiff to back away from the car.

66. Plaintiff backed away from the car, saying "Dude, it's not in that one."

67. Officer DiGeronimo replied that he was not "dude," and that his title was "Officer."

68. Plaintiff said that she, too, was in uniform, that she was a Sergeant, that she owned this car, that Officer DiGeronimo was not looking in the correct compartment, and that her registration could be found in the dashboard.

69. Officer DiGeronimo continued to search Plaintiff's car, ignoring her instructions for quickly locating her registration.

70. Plaintiff again tried to explain the situation, this time to Officer Giambrone.

71. Officer Giambrone told Plaintiff that the vehicle was reported stolen the prior day at 8:06 a.m.

72. By this time Plaintiff was suffering the extreme embarrassment and humiliation of standing before her commanding officers, supervisors, coworkers and friends in handcuffs and blue USAF uniform, being treated in an abrupt and forceful manner by two ACPD officers, as though she were a dangerous criminal bringing disrepute to the USAF.

73. Plaintiff mentioned her extreme embarrassment and humiliation to Officer Giambrone and Officer DiGeronimo.

74. More and more of Plaintiff's coworkers, associates and acquaintances from the office building, as well as total strangers from nearby office buildings, continued to flood onto the sidewalk to gawk at Plaintiff's ordeal.

75. Officer DiGeronimo finally located Plaintiff's car registration.

76. At this time, four more ACPD officers approached to assist with a situation already well under the control of Officer DiGeronimo and Officer Giambrone. Among these four officers were Officer B. Bennett ("Officer Bennett"), ACPD Badge #1307, and Officer W. Rodriguez ("Officer Rodriguez"), ACPD Badge #1219.

77. As Officer Rodriguez appeared to be the lead officer, Plaintiff pleaded with him, saying the car was hers, she herself had reported it stolen, and that the MPD had found it the night before and she had recovered it.

78. Officer Rodriguez replied that the fact that it was an MPD officer who had found the car would account for the confusion.

9

79. Plaintiff pleaded further with the officers on the scene, saying that Officer Fanone's card was in her car.

80. Officer Rodriguez replied that MPD officers did this kind of thing all the time, that is, that they often failed to take recovered stolen vehicles out of the LoJack system.

81. Officer Rodriguez stated further that Plaintiff's situation would have to be investigated.

82. Plaintiff continued to plead with Officer Rodriguez, asking what more the officers could need besides her ID and registration, which were now in their possession.

83. Officer Rodriguez requested that Plaintiff "just cooperate" and the situation would be cleared up.

84. Plaintiff begged to at least be released from her handcuffed state, pointing out that she was standing in front of her place of employment and that her supervisor was watching her ordeal from the sidewalk, compounding her humiliation.

85. Officer Rodriguez replied that they, that is, the ACPD police officers, had to do their job, too.

86. Officer Rodriguez then told Officer Bennett to escort Plaintiff to the front of a patrol car and seat her on the hood.

87. Plaintiff pleaded that she would rather not, as it would be uncomfortable in her physically stressful and painful handcuffed state. Plaintiff motioned with her cuffed hands to emphasize her point.

88. At this time, Plaintiff realized that no fewer than eight ACPD officers driving four ACPD squad cars and one ACPD motorcycle were on the scene, all with their roof lights flashing.

89. Plaintiff was distressed, mentally anguished, and still further humiliated to realize she was the center of spectator attention in the midst of this police drama, and that the treatment she was receiving, while in blue military uniform, from the ACPD made her appear to be a dangerous criminal bringing disrepute to the USAF in front of her commanding officers, supervisors, coworkers, friends and acquaintances assembled on the sidewalk.

90. Plaintiff was also in pain from the tight, binding handcuffs that shackled her wrists and held her arms in an unnatural position behind her back.

91. Plaintiff was not armed, was identified as the person in whose name the car was registered, and in view of these facts was unable to understand then, or at any time thereafter, why it was necessary to hold her in handcuffs.

92. Plaintiff asked Officer DiGeronimo why she was under arrest if she had already proved who she was and that the car was in her name.

93. Officer DiGeronimo explained that Plaintiff was not "under arrest," but was merely being "detained."

94. Plaintiff pointed out to Officer DiGeronimo that she was being "detained" in handcuffs.

95. Officer DiGeronimo explained further that the possibility existed that the car was jointly owned, for instance, by Plaintiff's husband, and that Plaintiff's husband had reported the car stolen.

96. Plaintiff informed Officer DiGeronimo that she was unmarried, and that she was the car's sole owner.

97. It appeared to Plaintiff at this time that Officer DiGeronimo got frustrated, as he replied that he was only giving Plaintiff one example of what the situation might be.

98. About ten minutes after this, Officer DiGeronimo and Officer Bennett stood beside Plaintiff as her supervisor, Major Cocanour ("Maj. Cocanour"), attempted to approach the scene.

99. Officer DiGeronimo told Maj. Cocanour to back off and remain on the sidewalk.

100. Maj. Cocanour backed off and remained on the sidewalk.

101. Plaintiff told Officer DiGeronimo that Maj. Cocanour was her supervisor.

102. Officer DiGeronimo inquired of Plaintiff what her supervisor's rank might be.

103. Plaintiff informed Officer DiGeronimo that Maj. Cocanour held the rank of Major in the USAF.

104. Officer DiGeronimo replied to Plaintiff, "Oh, that's all," made a dismissive gesture, and then walked over to Maj. Cocanour and spoke with him.

105. After speaking with Maj. Cocanour for five minutes, Officer DiGeronimo called for Plaintiff to walk over to where he was standing.

106. Plaintiff walked over to where Officer DiGeronimo was standing, escorted by Officer Bennett.

107. Officer DiGeronimo informed Plaintiff she could wait on the sidewalk.

108. Plaintiff, still with her hands cuffed tightly behind her back, waited on the sidewalk.

109. After approximately ten minutes, Maj. Cocanour approached Plaintiff to see whether she was all right. Maj. Cocanour informed Plaintiff that he had explained to Officer DiGeronimo that Plaintiff had not come into work on the previous day because her car had been stolen.

110. After another fifteen minutes, Maj. Cocanour's supervisor, Colonel Scott Grunwald ("Col. Grunwald") arrived at the scene.

111. At this time, Plaintiff noticed that three ACPD officers were in conversation with Maj. Cocanour and Col. Grunwald, another two ACPD officers were talking on cell phones, another ACPD officer was directing traffic, another ACPD motorcycle policeman was sitting on his motorcycle watching, and Officer Bennett was gathering information from Plaintiff.

112. Officer Bennett requested of Plaintiff her address, home phone number, cell phone number, and Social Security number.

113. Plaintiff provided her address, home phone number, and cell phone number to Officer Bennett, and asked him why he needed to know her Social Security number.

114. Officer Bennett informed Plaintiff that he needed her Social Security number to write it in a report.

115. After approximately fifteen minutes, Officer Rodriguez approached Plaintiff and informed her that the ACPD officers had not been able to contact MPD Officer Fanone.

116. Officer Rodriguez informed Plaintiff that ACPD officers had been able to verify that Plaintiff's car had been turned over to its owner the previous night.

117. Officer Rodriguez then, finally, released Plaintiff from the handcuffs that shackled her wrists tightly behind her back.

118. Officer DiGeronimo stated to Plaintiff, "If you want to blame someone, blame this guy," and waved Officer Fanone's card at Plaintiff.

119. Officer DiGeronimo stated to Plaintiff, "It's his fault that this happened to you." Plaintiff understood Officer DiGeronimo's comment as a reference to Officer Fanone.

120. Officer DiGeronimo then offered Plaintiff his card, asked whether Plaintiff would want him to testify, and informed her that her car was still identified by the LoJack system as a stolen vehicle.

121. Plaintiff requested the names and badge numbers of all ACPD officers present on the scene.

122. Plaintiff had been detained in handcuffs by ACPD officers well into the afternoon, in front of her place of employment and in full view of her commanding officers, supervisors, coworkers, friends and acquaintances.

123. Throughout her ordeal, Plaintiff's hands were at all times cuffed tightly behind her back.

124. Plaintiff suffered extreme shock and fright when she was in the line of fire of Officer DiGeronimo's gun.

125. Throughout her ordeal, Plaintiff suffered severe stress, emotional distress, and mental anguish from the humiliation of being detained like a dangerous criminal in front of her commanding officers, supervisors, coworkers, friends and

14

acquaintances, the people whose professional esteem and regard Plaintiff most cherishes.

126. Throughout her ordeal, Plaintiff suffered severe stress, emotional distress, and mental anguish from being treated like a dangerous criminal while in uniform, thus bringing disrepute to the USAF.

127. Plaintiff suffered physical distress and great pain from having her hands cuffed tightly behind her back for over an hour.

128. Plaintiff has a security clearance that is in the process of being upgraded. This clearance is held high and is limited to only certain Air Force personnel. The upgrade requires an investigation of Plaintiff's current friends, family and coworkers. Because of this incident, Plaintiff's Director had to send out an email to the entire organization, stressing Plaintiff's innocence the day of the event. Rumors began circulating that day to the effect that Plaintiff was guilt of crimes. Plaintiff's security clearance could be jeopardized by these rumors.

## COUNT I

## NEGLIGENCE

129. Plaintiff re-pleads and re-alleges paragraphs 1 through 128, with the same force and effect as if set forth separately at length herein.

130. Defendant District of Columbia's employee, Officer Fanone, had a duty of care to Plaintiff, namely, to take care of updating Plaintiff's car's status in the LoJack system from "stolen" to "recovered." Officer Fanone bore the responsibility of making this change, assured Plaintiff that he would take care of the matter, and told her she was "Good to go" after she recovered her car.

131. Defendant District of Columbia's employee, Officer Fanone, breached his duty of care to Plaintiff by failing to comply with standard and proper MPD procedures for auto-theft recoveries involving cars protected by LoJack when he neglected to update the status of Plaintiff's car in the LoJack system from "stolen" to "recovered."

132. As a result of Defendant District of Columbia's employee's breach of duty of care to Plaintiff, Plaintiff's car continued to transmit a "stolen vehicle" radio signal to nearby police, and Plaintiff was dramatically and humiliatingly detained in uniform by ACPD officers, in front of her place of employment and in full view of her commanding officers, supervisors, coworkers, friends and acquaintances.

133. Plaintiff suffered severe shock and fright when she was in the line of fire of Officer DiGeronimo's gun.

134. Throughout her ordeal, Plaintiff suffered severe stress, emotional distress, and mental anguish from the humiliation of being detained like a dangerous criminal, in uniform, in front of her commanding officers, supervisors, coworkers, friends and acquaintances, the people whose professional esteem and regard Plaintiff most cherishes.

135. Throughout her ordeal, Plaintiff suffered severe stress, emotional distress, and mental anguish from being treated like a dangerous criminal while in uniform, thus bringing disrepute to the USAF.

136. Throughout her ordeal, Plaintiff suffered physical distress and great pain from having her hands cuffed tightly behind her back.

137. An inference of negligence can be drawn between Defendant District of Columbia's employee's deviation from the applicable standard of care and Plaintiff's resulting injuries, namely, Plaintiff's detention by ACPD officers; her shock and fright; her stress, emotional distress, and mental anguish; her humiliation at being incorrectly labeled a criminal and bringing disrepute to the USAF; and her physical distress, pain, and suffering.

138. Officer Fanone was the servant, agent, and employee of Defendant District of Columbia, so that his acts are imputed to Defendant District of Columbia.

## COUNT II

## VIOLATION OF 42 U.S.C. § 1981

139. Plaintiff re-pleads and re-alleges paragraphs 1 through 138, with the same force and effect as if set forth separately at length herein.

140. Plaintiff, who is an African-American female, held herself out to enjoy the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens.

141. Plaintiff was denied by Defendant the full and equal benefit of all laws and proceedings for the security of persons and property enjoyed by others outside her protected class because of her race (African-American).

## RELIEF SOUGHT

142. Plaintiff re-pleads and re-alleges counts 1 through 141, with the same force and effect as if set forth separately at length herein.

143. Plaintiff requests the following relief:

144. Compensatory damages in the amount of $250,000.00 (Two Hundred and Fifty Thousand Dollars).

145. Pre- and post-judgment interest.

146. The costs of litigation, including reasonable attorney's fees and expert witness fees.

147. Such other relief that may be just.

## JURY DEMAND

148. Plaintiff demands a trial by jury.

Respectfully submitted,

Jimmy A. Bell, Esq.
Law Offices of Jimmy A. Bell, P.C.
9610 Marlboro Pike
Upper Marlboro, MD 20772
Tel.: (301) 599-7620
Fax: (301) 599-7623
Bar # MD 14639