# ATTACHMENT 1

# Event Chronology

**Event Number: I20050216510**

| Date | Time | Term | Operat | Action |
|------|------|------|--------|--------|
| 04/25/05 | 21:31:23 | d02 | 1287 | EVENT CREATED: Location= 700 14TH ST NW DC , Cross Streets= G ST NW / NEW YORK AVE NW , Call |

Source= OFFICER
Agency= MPD , Group= 1D , Beat= 101 , Status= A , Priority= 3 , ETA= 0 , Hold Type= 0 ,
Primary Unit= 1011 , Primary Member= 6975 , Current= F , Open Current= F , Type Code= RSAU -
RECOVERY OF STOLEN AUTO , SubType Code= CCN - CASE NUMBERS
Unit= 1011 , Status= DP , Location= 700 14TH ST NW DC , Employee= 6975 , Employee= 6845
EVENT COMMENT= Field Event
ON LOJACK HIT LG1SU...ON FL/XB4VFW

| 04/25/05 | 21:31:24 | d02 | 1287 | Unit= 1011 , Status= AR , Location= 700 14TH ST NW DC , Employee= 6975 , Employee= 6845 |
| 04/25/05 | 21:31:25 | cadcomd | 1287 | EVENT COMMENT= ** LOI search completed at 04/25/05 21:31:25 |
| 04/25/05 | 21:31:42 | d02 | 1287 | Unit= SB101 , Status= DP , Location= 700 14TH ST NW DC , Employee= 6154 |
| 04/25/05 | 21:31:44 | d02 | 1287 | Unit= SB101 , Status= AR , Location= 700 14TH ST NW DC , Employee= 6154 |
| 04/25/05 | 21:31:47 | d02 | 1287 | Unit= CR122 , Status= DP , Location= 700 14TH ST NW DC |
| 04/25/05 | 21:31:48 | d02 | 1287 | Unit= CR122 , Status= AR , Location= 700 14TH ST NW DC |
| 04/25/05 | 21:33:04 | d02 | 1287 | EVENT COMMENT= ORIG TIME 2122....D1287 |
| 04/25/05 | 21:44:44 | d02 | 1287 | Unit= 1041 , Status= DP , Location= 700 14TH ST NW DC , Employee= 6210 , Employee= 6305 |
| 04/25/05 | 21:44:56 | d02 | 1287 | Unit= 1041 , Status= ER , Location= T/C TP FOR 1011 , Employee= 6210 , Employee= 6305 |
|  |  |  |  | Unit= 1041 , Status= CL , Location= T/C TP FOR 1011 , Employee= 6210 , Employee= 6305 |
| 04/25/05 | 21:44:56 | cadcomd | 1287 | EVENT COMMENT= ** LOI search completed at 04/25/05 21:44:56 |
| 04/25/05 | 21:48:28 | d02 | 1287 | Unit= 1041 , Status= AR , Location= T/C TP FOR 1011 , Employee= 6210 , Employee= 6305 |
| 04/25/05 | 21:48:38 | d02 | 1287 | CASE NUMBER ASSIGNED= R2005052761 |

Disposition Assigned= ASSNCASE
EVENT COMMENT= ** Case number R2005052761 has been assigned
** >>>> by: JACQUELIN E. WHITE on terminal: d02

| 04/25/05 | 21:48:48 | d02 | 1287 | EVENT UPDATED: Location= 700 14TH ST NW DC , Cross Streets= G ST NW / NEW YORK AVE NW , Call |

Source= OFFICER
Agency= MPD , Group= 1D , Beat= 101 , Status= A , Priority= 3 , ETA= 0 , Hold Type= 0 ,
Primary Unit= 1011 , Primary Member= 6975 , Current= F , Open Current= F , Type Code= UUV -
UNATHORIZED USE OF VEHICLE , SubType Code= NOS3 - NUMBERS ONLY
EVENT COMMENT= ** Event Type changed from RSAU(CCN) to UUV(NOS3) at 04/25/05
21:48:48

** >>>> by: JACQUELIN E. WHITE on terminal: d02

| 04/25/05 | 21:48:56 | d02 | 1287 | Unit= 1011 , Status= ER , Location= T/C 1 ARREST , Employee= 6975 , Employee= 6845 |
|  |  |  |  | Unit= 1011 , Status= CL , Location= T/C 1 ARREST , Employee= 6975 , Employee= 6845 |
| 04/25/05 | 21:49:02 | cadcomd | 1287 | EVENT COMMENT= ** LOI search completed at 04/25/05 21:49:02 |
| 04/25/05 | 21:57:59 | d02 | 1287 | Unit= SB101 , Status= AV , Location= 700 14TH ST NW DC , Employee= 6154 |
| 04/25/05 | 22:03:01 | d02 | 1287 | Unit= CR122 , Status= AQ |
| 04/25/05 | 22:04:46 | d02 | 1287 | Unit= 1011 , Status= AR , Location= T/C 1 ARREST , Employee= 6975 , Employee= 6845 |
| 04/25/05 | 22:38:51 | d01 | 5784 | Unit= 1041 , Status= AR , Location= T/C TP FOR 1011 , Employee= 6210 , Employee= 6305 |
| 04/25/05 | 22:49:30 | d01 | 5784 | Unit= 1041 , Status= AV , Location= T/C TP FOR 1011 , Employee= 6210 , Employee= 6305 |
| 04/25/05 | 22:51:15 | d01 | 5784 | Agency= MPD , Group= 1D , Beat= 101 , Status= A , Priority= 3 , ETA= 0 , Hold Type= 0 , |

Primary Unit= 1011 , Primary Member= 6975 , Current= T , Open Current= F , Type Code= UUV -
UNATHORIZED USE OF VEHICLE , SubType Code= NOS3 - NUMBERS ONLY
EVENT CLOSED:
Unit= 1011 , Status= AV , Location= T/C 1 ARREST , Employee= 6975 , Employee= 6845

# ATTACHMENT 2

## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

**ALICIA Y. ALFRED,**

**Plaintiff,**

v.

Civil Action No. 05-1446 (PLF)

**DISTRICT OF COLUMBIA,**

**Defendant &
Third Party Plaintiff,**

v.

**THE LOJACK COMPANY,** *et al.,*

**Third Party Defendants.**

### AFFIDAVIT OF OFFICER MICHAEL F. FANONE

**District of Columbia, ss:**

I, **MICHAEL F. FANONE,** do swear and affirm that the following is true and accurate to the best of my knowledge, information and belief:

1.      I am a District of Columbia Metropolitan Police Officer, in the First District. I have served in that capacity since September 29, 2003. As such, it is my responsibility to patrol the streets of the District of Columbia to protect citizens from crime.

2.      On April 25, 2005, I was assigned to the First District. My tour of duty was from 2:00 p.m. to 10:30 p.m. My patrol car was equipped with a LoJack tracking device. My partner was Officer Im Sang. At about 9:30 p.m., Officer Sang and I located a vehicle that was emitting a LoJack signal. We tracked the vehicle for about twenty minutes. We stopped the vehicle in the 700 block of 14th Street, N.W., Washington, D.C.

3.    Officer Sang and I apprehended the individual in the vehicle and called the owner, Alicia Y. Alfred, to the scene. Ms. Alfred stated that the apprehended driver was her brother and that she wanted him arrested. Officer Sang and I arrested him for the "unauthorized use of a motor vehicle." This arrest was made towards the end of my tour of duty that night. Officer Sang and I completed the arrest paperwork past our tour of duty.

4.    It was my customary practice after a vehicle had been recovered, to call Teletype by telephone at the police station to report the recovery of the vehicle. I do not recall any variance in that routine regarding this vehicle recovery.

_____
**OFFICER MICHAEL FANONE    May 31, 2007**
**D.C. Metropolitan Police Officer**

Subscribed and sworn to before me this    31st day of    May            , 2007.

My commission expires: 2/08/09          .

_____
NOTARY PUBLIC

2

# ATTACHMENT 3

DEPOSITION OF ALICIA YOLANDA ALFRED
Conducted on August 29, 2007

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

----------------------------------x

ALICIA Y. ALFRED,                         x

            Plaintiff,            x   1:05

            v.                    x   CV 01446 PLF

DISTRICT OF COLUMBIA and          x

THE LOJACK COMPANY, et al.,       x

            Defendants.           x

----------------------------------x

                         Wednesday, August 29, 2007
                         Washington, D.C.


The deposition of ALICIA YOLANDA ALFRED called for

examination by counsel for Defendants in the

above-titled matter, pursuant to notice, in the

Offices of the Attorney General for the District of

Columbia, 441 Fourth Street, Northwest, Washington,

D.C., before Jonell Easton, notary public in and

for the District of Columbia, at 10:45 a.m., when

were present on behalf of respective parties:

DEPOSITION OF ALICIA YOLANDA ALFRED
Conducted on August 29, 2007

Page 2

On behalf of the Defendant District of Columbia:

1  On behalf of the Defendant District of Columbia:
2  URENTHEA MCQUINN, ESQUIRE
3  Assistant Attorney General
4  Office of the Attorney General
5  441 Fourth Street, Northwest
6  Washington, D.C. 20001
7  202.724.6646
8
9
10  On behalf of the Defendant LoJack Company:
11  WARREN D. STEPHENS, ESQUIRE
12  DeCaro, Doran, Siciliano,
13  Gallagher & DeBlasis, LLP
14  4601 Forbes Boulevard
15  Suite 200
16  Lanham, Maryland 20703-0040
17  301.306.4300
18
19
20
21

Page 4

## CONTENTS

1  EXAMINATION BY COUNSEL      PAGE
2
3  MS. MCQUINN                    4, 60
4  MR. BELL                       58
5  MR. STEPHENS                   --
6
7  ALFRED EXHIBITS
8  DEPOSITION EXHIBITS            MARKED
9  No. 1 A  Notice                11
10  No. 1 B  Defendant's interrogatories   11
11  No. 2    Second amended complaint      11
12  No. 3    Email correspondence          11
13  No. 4    Plaintiff's answers           11
14  No. 5    Defendant's supplemental answers  11
15  No. 6    Motion for summary judgment   11
16  No. 7    LoJack document               11
17  No. 8    Affidavit of James A. Justice  11
18  No. 9    Authorization                 12
19  No. 10   Plaintiff's answers           16
20           (Exhibits attached.)
21  Motion to Compel:  Pages 14, 40, 44, 45

Page 3

1  On behalf of the Plaintiff:
2  JIMMY A. BELL, ESQUIRE
3  Law Office of Jimmy A. Bell, P.C.
4  9601 Marlboro Pike
5  Upper Marlboro, Maryland 20772
6  301.599.7620
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21

Page 5

PROCEEDINGS

1  PROCEEDINGS
2  Whereupon,
3  ALICIA YOLANDA ALFRED
4  was called for examination by counsel for
5  Defendants and, after having been first duly sworn
6  by the notary public was examined and testified as
7  follows:
8  EXAMINATION BY COUNSEL FOR DEFENDANTS
9  BY MS. MCQUINN:
10  Q.  Good morning, my name is Urenthea McQuinn,
11  and I am an Assistant Attorney General for the
12  District of Columbia Government.
13  We are here to take the deposition of
14  Alicia Y. Alfred in the case of Alicia Y. Alfred
15  versus the District of Columbia, et al., Civil
16  Number 2005 hyphen 1446.
17  Ms. Alfred, you have been sworn in.
18  Have you ever been deposed before?
19  A.  No.
20  Q.  In a deposition, I get to ask you
21  questions about your case.  There will be times

2 (Pages 2 to 5)

DEPOSITION OF ALICIA YOLANDA ALFRED
Conducted on August 29, 2007

Page 6

1  your attorney might object. The difference between
2  a deposition and a trial is when an attorney
3  objects in deposition, quite often he lets you
4  answer the question.
5      The objective in a deposition is to get
6  information so even though he might object, he
7  might tell you to answer.
8      A.  Okay.
9      Q.  If you have problems with my question, you
10  have to let me know. If you answer, I will assume
11  you understood it.
12      You have to speak up and avoid gestures
13  because the court reporter can't take down
14  gestures.
15      A.  Okay.
16      Q.  Please state your name.
17      A.  Alicia Yolanda Alfred.
18      Q.  Spell that, please.
19      A.  A-L-I-C-I-A, Y-O-L-A-N-D-A, A-L-F-R-E-D.
20      Q.  What is your age?
21      A.  I am 34.

Page 7

1      Q.  What is your date of birth?
2      A.  December 15, 1972.
3      Q.  What is your current address?
4      A.  2306 North Capitol Street, Northwest,
5  Washington, D.C.
6      Q.  What was your address on April 25 and 26,
7  2005?
8      A.  3032 Bellamy Way, Suitland, Maryland.
9      Q.  What is your Social Security number?
10      A.  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.
11      Q.  What is your educational background?
12      A.  I have a bachelor's degree in business
13  management, information technology.
14      Q.  Where from?
15      A.  University of Maryland, University
16  College.
17      Q.  What year did you get your bachelor's?
18      A.  2003.
19      Q.  What was your high school?
20      A.  Brandon High School in Tampa, Florida.
21      Q.  Did you come to Maryland after you

Page 8

1  graduated from high school?
2      A.  No, I am in the United States Air Force, I
3  started the University of Maryland abroad and I
4  finished here.
5      Q.  How long have you been in the military?
6      A.  Fourteen years and 11 months.
7      Q.  Which branch?
8      A.  United States Air Force.
9      Q.  What is your rank?
10      A.  Sergeant, E 6.
11      Q.  What do you do?
12      A.  I am an information manager, I am, since I
13  moved positions, so then I was information manager
14  to the secretary of the Air Force, acquisitions,
15  and worked in Rosslyn, Virginia.
16      I work in the Pentagon, right now.
17      Q.  What do you do?
18      A.  Information manager for the secretary of
19  the Air Force.
20      Q.  I need you to speak up.
21      A.  Okay.

Page 9

1      Q.  You moved?
2      A.  I moved positions.
3      Q.  Meaning what?
4      A.  My job location and duty assignment was in
5  Rosslyn, Virginia, and as of two weeks ago, I moved
6  my position, my job moved back into the Pentagon, I
7  am physically located in the Pentagon now.
8      Q.  I have answers to discovery from your
9  attorney. One states you have not had any recent
10  medical treatment. Is that correct?
11      When was the last time you had medical
12  treatment of any kind?
13      A.  Any kind, Monday.
14      Q.  What was that for?
15      A.  Lower back pain.
16      Q.  What was, that was from what doctor?
17      A.  Dr. Porter in the Pentagon, the DeLorenzo
18  Clinic.
19      Q.  Do you know the full name of the doctor?
20      A.  No, we see several doctors. I don't have
21  a main doctor I go to for everything, so we can ---

3 (Pages 6 to 9)

DEPOSITION OF ALICIA YOLANDA ALFRED
Conducted on August 29, 2007

Page 10

1  the military is quite different.
2      Q.  How many times have you seen a doctor for
3  lower back pain?
4      A.  This was the first time.
5      Q.  Is it associated with this incident in any
6  way?
7      A.  No.
8      Q.  Have you been treated in the last five
9  years by any other doctors?
10     A.  Yes.
11     Q.  Who were they?
12     A.  I have had several doctors.  I was
13  involved in a motor vehicle accident and I have
14  been through several surgeries.
15     Q.  What year was the accident?
16     A.  2002.
17     Q.  You were treated by whom?
18     A.  I have several doctors.  I can't recall
19  the different names.
20     Q.  Were they doctors in the service or?
21     A.  Always within the United States Air Force,

Page 11

1  all procedures were done on a military base.
2      Q.  Aside from that accident, any other
3  reasons for doctor's treatment?
4      A.  Just my personal issues and such.
5      Q.  Have you had any treatment for mental
6  health, psychological or psychiatric issues?
7      A.  No.
8      Q.  Have you had any treatment for stress?
9      A.  No.
10         MS. MCQUINN:  I have had this marked as
11  deposition Exhibit 1 A.
12         (Alfred Deposition Exhibits Nos. 1A
13  through 8 were marked for identification.)
14         BY MS. MCQUINN:
15     Q.  Have you ever seen this document before?
16     A.  Yes.
17     Q.  I have had this marked as 1B.  This was
18  1A, the notice of deposition is 1A, the
19  interrogatories from the District of Columbia to
20  you.
21     A.  Yes.

Page 12

1      Q.  These interrogatories, I have on number
2  1A, which ask for documents, and the notice of
3  deposition, the paragraph at the bottom of the
4  first page requests documents from you?
5      A.  Right.
6      Q.  Did you bring any documents with you
7  today?
8      A.  Yes.
9      Q.  May I have those, please?
10     A.  Okay.
11         (Witness complies.)
12         MS. MCQUINN:  Please have this marked as
13  number nine.
14         (Alfred Deposition Exhibit No. 9 was
15  marked for identification.)
16         BY MS. MCQUINN:
17     Q.  Tell us what these documents are you
18  brought today.
19     A.  Okay, the first one I just signed here, I
20  think this is for my income tax returns.
21     Q.  Authorization?

Page 13

1      A.  Authorization for income tax return.
2         Employment and income insurance
3  information.
4      Q.  Is that an authorization also?
5      A.  Authorization, yes.
6      Q.  Did you have an authorization for medical
7  records in there?
8      A.  No.
9      Q.  Why is that?
10         MR. BELL:  Objection.  She is not claiming
11  any medical damages.
12         BY MS. MCQUINN:
13     Q.  You are not claiming stress?
14         MR. BELL:  She has not.
15         THE WITNESS:  I haven't seen a doctor for
16  stress.
17         BY MS. MCQUINN:
18     Q.  You won't be making a claim for stress?
19     A.  I am not saying that.
20         I am saying I have not gone to my doctor
21  to receive any treatment or any type of medication

4  (Pages 10 to 13)

DEPOSITION OF ALICIA YOLANDA ALFRED
Conducted on August 29, 2007

Page 14

1  or to be seen for stress.
2      MS. MCQUINN:  About this stress, make a
3  note for the record for a motion to compel for
4  authorization regarding medical records and any
5  mental health type records.
6      BY MS. MCQUINN:
7      Q.  What else do you have?
8      A.  Acknowledgement, of receipt of letter from
9  D.C. Office of Risk Management, Risk Financing
10 Division.
11     This is a card, copy of a card, on the day
12 of the event, my entire office witnessed the
13 incident.
14     Q.  In Virginia?
15     A.  Yeah.
16     And the next one is an email sent out by
17 our director to our organization explaining the
18 situation because of rumors and the backlash from
19 the incident.
20     Q.  This was in Virginia, as well?
21     A.  This was at my office in Virginia.

Page 15

1      Q.  What part of Virginia?
2      A.  My office in Rosslyn, Virginia.
3      This is a letter from a witness,
4  Mr. Derrick Tanner.
5      Q.  He was located where?
6      A.  At 1500 Wilson Boulevard, Arlington,
7  Virginia, where it happened, along with a letter
8  from Dedra Lewis, at the same location, Arlington,
9  and her background information.
10     (Pause in the proceedings.)
11     BY MS. MCQUINN:
12     Q.  Deposition Exhibit 3 and Number 4 are your
13 answers to interrogatories.
14     Have you seen Exhibits 3 and 4 before?
15     A.  Yes.
16     Q.  Is there a reason why you haven't signed
17 your answers to interrogatories?
18     A.  I have a signed copy.
19     Q.  Do you have it with you?
20     A.  Yes.
21     Q.  Do you mind giving us a signed copy?

Page 16

1      A.  My attorney has to sign it.
2      MR. BELL:  Okay.
3      MS. MCQUINN:  Let's mark this as the next
4  exhibit, please.
5      (Alfred Deposition Exhibit No. 10 was
6  marked for identification.)
7      BY MS. MCQUINN:
8      Q.  Your complaint, I will show you the Second
9  Amended Complaint, which has been marked Deposition
10 Exhibit 2.
11     Your complaint alleges, on April 25, 2005,
12 your car was stolen.
13     What was the make, model and color?
14     A.  Black Jaguar, S type.
15     Q.  Year?
16     A.  2000.
17     Q.  How long had you had the car?
18     A.  The car was purchased in 2003.
19     Q.  Where had you parked it?
20     A.  When it was stolen?
21     Q.  Yes.

Page 17

1      A.  The car was stolen in my driveway.
2      Q.  What is the address?
3      A.  3032 Bellamy Way, Suitland, Maryland
4  20046.
5      Q.  At some point, did you become aware who
6  had stolen your car?
7      A.  Yeah, when it was recovered, one of the
8  officers called me.
9      Q.  Who had stolen it?
10     A.  Ramon Taylor.
11     Q.  Who is that?
12     A.  My brother.
13     Q.  How old is he?
14     A.  At that time or now?
15     Q.  How old is he now?
16     A.  Thirty-five.
17     Q.  When it was stolen, he was what age?
18     A.  This is two years ago.
19     Q.  Thirty-three?
20     A.  Yes.
21     Q.  What is his birth date?

5 (Pages 14 to 17)

DEPOSITION OF ALICIA YOLANDA ALFRED
Conducted on August 29, 2007

Page 18

1      A. October 28, 1971.
2      Q. Where did he live at the time he stole
3  your car?
4      A. 3032 Bellamy Way.
5      Q. He lived with you?
6      A. Yes.
7      Q. Who else lived with you at that time?
8      A. No one else.
9      Q. How long had he lived with you?
10     A. Four months.
11     Q. He had come to live with you after having
12 lived where?
13     A. California.
14     Q. Who was in California, had he lived with
15 his family?
16     A. He lived by himself.
17     Q. Was there a specific purpose for his
18 having come to live with you?
19     A. As?
20     Q. As opposed, was there some specific
21 purpose for his having moved into your home at 33

Page 19

1  years of age?
2      A. Is that relevant?
3      Q. Yes.
4      A. I don't see how it is relevant.
5         His purpose was just to come live with me
6  to live in a different area.
7      Q. He had come to live there permanently?
8      A. Not necessarily.
9      Q. But for how long, was there any discussion
10 of how long he was going to stay at your home?
11     A. It was more of he was going to come see if
12 he liked the area.
13     Q. Did he move all of his things to your
14 house?
15     A. No, he had luggage.
16     Q. Did he maintain a home in California?
17     A. I imagine so.
18     Q. What was the address?
19     A. No idea.
20     Q. What city?
21     A. He moved around a lot.  I don't know his

Page 20

1  last location.
2      Q. How long had he lived in California?
3      A. He had been in California, he left the
4  military in 1992, 1993, I believe 1996.
5      Q. You said you joined the military in?
6      A. 1992.
7      Q. Had you permitted him to drive your car
8  previously?
9      A. No.
10     Q. So this was his first time behind the
11 wheel of your car, to your knowledge?
12     A. Yeah.
13     Q. Had he asked you to use your car?
14     A. No.
15     Q. Had he ever stolen your car before that
16 date?
17     A. No.
18     Q. At the scene, after recovery of your car,
19 did you request his arrest?
20     A. Yes.
21     Q. Was he, in fact, arrested?

Page 21

1      A. Yeah.
2      Q. Did you press charges?
3      A. Yes.
4         THE WITNESS:  I have a question.
5         MR. BELL:  You can't ask a question.
6         THE WITNESS:  If I didn't understand?
7         BY MS. MCQUINN:
8      Q. There is no question before you right now.
9      A. Okay.
10     Q. You will get a chance.
11        MR. BELL:  Wait.
12        BY MS. MCQUINN:
13     Q. I will hand her Exhibit 5, D.C.
14 Supplemental Answers, Answers to Interrogatories,
15 and we have the arrest report, that paragraph talks
16 about the arrest of your brother.
17        What was he arrested for at the time?
18        MR. BELL:  Objection.
19        You can answer.
20        BY MS. MCQUINN:
21     Q. If you know.

6  (Pages 18 to 21)

DEPOSITION OF ALICIA YOLANDA ALFRED
Conducted on August 29, 2007

Page 22

1    A.  Taking my car, right.
2        Is that what you are asking me, what was
3    he arrested for?
4    Q.  Right.
5        Was that all he was arrested for?
6    A.  To my knowledge.
7    Q.  Did anything precipitate his having stolen
8    your car?
9    A.  No.
10   Q.  There was no argument between the two of
11   you?
12   A.  No, no.
13   Q.  What punishment, if any, did he receive?
14   A.  He spent the night in jail.  That is all I
15   know.  He no longer lived with me after that point.
16   Q.  He never came back to your home?
17   A.  He came to get his stuff.
18   Q.  Was it, how soon after he got out of jail
19   did he come to get his things?
20   A.  I think he stayed in jail for a day, so
21   within the next couple of days he came.

Page 23

1    Q.  Did you have a conversation with him?
2    A.  Yeah.
3    Q.  Did you ascertain why he had stolen your
4    car?
5    A.  Yes.
6    Q.  Did he tell you?
7    A.  Yeah.
8    Q.  What?
9    A.  That he was going to bring it back.
10   Q.  Did he say, had he asked you to use the
11   car in any form or fashion before having taken that
12   car?
13   A.  No.
14   Q.  Did you ask him why he didn't ask you
15   first?
16   A.  He thought I didn't mind.
17   Q.  Which one of you is older?
18   A.  He is.
19   Q.  He was born in 19 what?
20   A.  He was born a year before me.
21   Q.  I want you to tell us.

Page 24

1        MR. BELL:  Are we finished with this
2    exhibit?
3        MS. MCQUINN:  I don't think so.
4        Did you want something?
5        MR. BELL:  Yes, can you leave the room.
6        (Witness leaves the room.)
7        MR. BELL:  In your motion to compel, you
8    stated on the record that I never propounded,
9    plaintiff never propounded discovery.  You have
10   produced discovery, you admitted it.
11       Are you going to correct the record?
12       MS. MCQUINN:  I don't know what you are
13   talking about, right now.  Get this very clear, I
14   am here for deposition of this client.  I am not
15   here to argue with you.  I will look into what you
16   are saying and I will deal with it.
17       MR. BELL:  It is real clear.  You are an
18   officer of the court.
19       MS. MCQUINN:  I will not deal with that
20   now.  I am willing to entertain your question
21   later.

Page 25

1        MR. BELL:  We are not finished talking.
2        MS. MCQUINN:  Yes, we are.
3        MR. BELL:  Stay out there, I will enter it
4    later not now.
5        Stay out there.  I need to be able to put
6    what I need to do on the record.  Close the door.
7        MS. MCQUINN:  Come in.
8        MR. BELL:  Not before we deal with this.
9        MS. MCQUINN:  I will not give you an
10   answer, I will look at what you are asking.
11       MR. BELL:  I haven't finished asking.
12       MS. MCQUINN:  Get that out of your system.
13   I will not deal with it.
14       MR. BELL:  When you make the
15   representation to the court that you, that
16   plaintiff did not propound discovery and then you
17   produced discovery, you answered that and plaintiff
18   propounded and then you attempted to ask my client
19   a question.  I am asking you are you going to
20   correct that misrepresentation to the court, yes or
21   no.

7 (Pages 22 to 25)

DEPOSITION OF ALICIA YOLANDA ALFRED
Conducted on August 29, 2007

Page 26

1    MS. MCQUINN: I will look at it later. It
2  is not in front of me.
3    MR. BELL: I will file a motion today.
4    MS. MCQUINN: Come in, Ms. Alfred.
5    (Witness returns to the room.)
6    BY MS. MCQUINN:
7    Q. On April 25, 2005, you stated in your
8  complaint that you got up that morning and found
9  out your car was stolen. Tell us the details, what
10  happened on that morning.
11    A. I woke up to go to work and my car was not
12  there and I tried to figure out what happened with
13  my car.
14    A few hours later, I went ahead and
15  reported it stolen and called the Prince George's
16  County police and they reported it stolen and
17  notified, I had LoJack, and they said they would,
18  once your car is reported stolen, the LoJack
19  automatically, you know, was turned on through the
20  NCIC system or something of that reference.
21    And around 9:00 that night, between 9:00

Page 27

1  and 10:00, I got a call from an Officer Fanone. He
2  informed me he had recovered my car and that he had
3  Ramon Taylor in custody and asked me if I wanted
4  him arrested. I told him yes.
5    He asked me if I gave him permission to
6  drive the car and I sad no, could I come pick up my
7  car.
8    And I said yes or did I want it towed to
9  the police department, I said no, I will come.
10    I had a girlfriend come and pick me up.
11  We picked, she came by and picked up the car and
12  the officer gave me my keys, I inspected the car
13  and looked at the car.
14    And I said, he gave me my keys, and I said
15  is that it and he said yeah. I said is it all
16  right for me to drive. He said yes.
17    Q. Can I stop you, the officer we are talking
18  about is Michael Fanone?
19    A. I'm sorry, Officer Fanone, and that is
20  when my girlfriend asked for his card, do you have
21  a card in case we have questions.

Page 28

1    That is when he supplied me with his card
2  and said that, don't worry, your car is fine, you
3  out of the system, you can drive home.
4    We went to Kinko's after because we were
5  working on a project. When I came out of Kinko's,
6  two officers drove up beside and asked me was this
7  my car.
8    Q. Where was that Kinko's located, in what
9  state?
10    A. D.C. off of F Street.
11    Q. These officers were what, with D.C. or
12  what type of officers?
13    A. D.C. officers of the same car.
14    Q. Talking about the police officers?
15    A. D.C. police officers, yes.
16    Matter of fact, they asked me was this my
17  car and I told them yes, sir, yes, I just recovered
18  it, I have a card that Officer Fanone gave me and
19  and I handed them the card and they looked at it,
20  oh, and they said it, his first name, said okay,
21  all right, we checked you, looked you up, your car

Page 29

1  has been reported recovered.
2    They gave me the card back and said be
3  careful on your way home. I guess it was not out
4  of the system, may take a couple of more minutes.
5    So I then later stopped at a gas station
6  on my way back and there were two officers at the
7  gas station and these were off of Pennsylvania
8  Avenue, D.C. police officers, but they didn't say
9  anything to me, so I assumed I was clear to go and
10  thought everything was fine.
11    Then I got up the next morning and that is
12  when I went to work and then ---
13    Q. Now talking about April 26, 2005?
14    A. Right, actually, when the two D.C. cops
15  stopped me, asked me if it was my car, it was
16  midnight April 26.
17    So yeah, April 26, around 6:30, I got up
18  to go work at 7:00 and then that is when I parked
19  right in front of building.
20    Q. You drove to work in the same previously
21  stolen car?

8 (Pages 26 to 29)

DEPOSITION OF ALICIA YOLANDA ALFRED
Conducted on August 29, 2007

Page 30

1    A.  Right, I only have one car, so it would be
2  the same car.
3    Q.  Is there a reason you didn't call anybody
4  after you had been told you were still emitting a
5  signal?
6    A.  Reason is they reassured me, said it
7  emitted a signal, but it should be out of the
8  system in a couple of minutes.
9      Had I known, I would not have driven my
10  car, especially to Virginia.
11    Q.  Did you check that morning, call any
12  place?
13    A.  As I stated before, because I stopped at
14  the gas station, two cops were there, they didn't
15  stop or say anything about a stolen car signal
16  coming to them, then, at that time, that told me
17  well, maybe the system, maybe I am out of system.
18    Q.  I want to ask you one more time.
19      Before you left the house, did you make
20  any calls to check to see if you were still
21  emitting a signal?

Page 31

1    A.  Before I left?  Officer Fanone, he --- I
2  checked with him to reassure me it was out of the
3  system and he told me, yes.
4      For me to go behind him and check --- and
5  who would have checked with, I had no idea
6  because you call it in to the cops, I recovered it
7  from the cops, a D.C. police officer tells me it is
8  out of the system, that is what --- I took his
9  word.
10      He told me it was out.  I took it that it
11  was out of the system.  I had no idea it was my
12  responsibility to go behind a police officer, do
13  his job and check to make sure the system, I was
14  out of the system.
15      I didn't put myself in the system.  I
16  can't take myself out, I didn't call --- I called
17  the cops, law enforcement, I am automatically
18  entered, they told me I was automatically taken out
19  once it was recovered, so, no, there was no one for
20  me to call.
21    Q.  You did not call the police?

Page 32

1    A.  Why?
2    Q.  Don't ask me questions.
3      You didn't call the police?
4    A.  I asked the police, yes.
5    Q.  The morning before you left the house?
6    A.  I asked the police when they recovered the
7  car.  I did not again call or contact more police
8  officials to verify that the first police officer
9  was telling me the truth.
10    Q.  The morning before you left, you did not
11  call the police?
12    A.  No, I never called the police after I
13  recovered my car.
14    Q.  The morning before you left the house, did
15  you call LoJack?
16    A.  No.
17    Q.  Ever?
18    A.  I did not call LoJack to put myself in the
19  system --- actually I called LoJack two days after
20  the incident.  LoJack said they cannot remove me
21  out of the system, it was no need to call LoJack,

Page 33

1  they could not remove me out of system.
2    Q.  You got in the car and drove where that
3  morning?
4    A.  As I stated earlier, I drove to work at
5  6:30 in the morning, I drove to make sure I was at
6  work at 7:00.
7    Q.  What is the address?
8    A.  1500 Wilson Boulevard, I park right there.
9    Q.  Which state?
10    A.  1500 Wilson Boulevard, Arlington.
11    Q.  You left home approximately what time?
12    A.  I just stated the time.
13    MS. MCQUINN:  Read it back to me.
14    (The record was read, as requested, by the
15  court reporter.)
16    BY MS. MCQUINN:
17    Q.  You arrived at approximately what time?
18    A.  7:00.
19    Q.  After arriving at approximately 7:00 in
20  the morning, what did you do?
21    A.  I went to work and I worked.

9 (Pages 30 to 33)

DEPOSITION OF ALICIA YOLANDA ALFRED
Conducted on August 29, 2007

Page 34

1    Q. At some point, did you come out of the
2    building?
3    A. At lunch time, I went to lunch.
4    Q. Approximately what time?
5    A. 11:00, 11:30.
6    Q. What, you came out to lunch, what
7    happened?
8    A. I noticed several police officers in the
9    area.
10   Q. From what jurisdiction?
11   A. I assume Arlington since I was in
12   Arlington, so I would assume it was Arlington and I
13   got in my car, was talking on my cell phone, got in
14   my car, pulled out into the middle of the road and
15   drove about, I guess, ten meters.
16       And that is when several officers came
17   out, one in front, one in back, both had guns
18   pointed at me, told me to get out of my car.
19       I was dressed in uniform, military blues
20   uniform, they told me put my hands up, get away
21   from the car, step back from the car, hands up.

Page 35

1        I began thinking they must think I took my
2    own car. I said this is my car.
3        The officers didn't really listen and I
4    was at gun point, I pretty much did what they said,
5    had my hands up, one or the other had his gun on me
6    and they handcuffed me.
7        I told them this is my car, look at my
8    registration.
9        They did not. At that time, they wasn't
10   really listening, they was really trying to detain
11   or arrest me and they went into my car. I said you
12   can look for my registration, he was looking in the
13   middle compartment, the registration was in the
14   glove compartment, I said this is not it, it's in
15   the glove compartment not the middle.
16       I tried to show them, gestured, they were
17   back away from the car, straddle your legs, they
18   patted me down.
19       He got the registration, saw the
20   registration was in my name and still insisted on
21   detaining me, arresting me.

Page 36

1        By that time because it was lunch, the
2    street was filled with my co workers and people
3    from other buildings.
4        I asked them please can we not do this
5    right here in front of my office. I was pretty
6    much begging because I was embarrassed.
7        My supervisor came down, everybody knows
8    my car, they would not allow him to ---
9    Q. Who?
10   A. My supervisor.
11   Q. What is the name?
12   A. Major Niles Cocanour, he was told get back
13   on the sidewalk.
14       By that time, they told me, pretty much
15   pulled me over into, pulled me further down the
16   street to the squad car, told me sit down in the
17   car, I refused because it was uncomfortable with my
18   hands cuffed behind my back.
19       At that time, I began to reason --- if the
20   registration is in my name, you have my
21   identification, I had a military, Pentagon badge on

Page 37

1    my shirt.
2        The reason was it could be my husband's
3    car. I told them there was one name on the
4    registration, he got upset.
5        I am giving an example what could have
6    happened and then, by this time, my supervisor,
7    boss came down and was trying to reason with the
8    cops.
9        They told everybody again stand to the
10   curb and then I tried, at least talk to my boss, he
11   will explain because I called out the day before, I
12   couldn't get to work, he knew my car was stolen.
13       He went over to talk to my boss and then
14   they allowed me to come on the sidewalk, still
15   handcuffed.
16       My boss told me, I told them you had
17   called out because your car was stolen. I guess he
18   understood it, so that I also gave him the card
19   from Fanone, I gave them his card.
20       They tried to contact him, could not reach
21   him, could not contact him.

10 (Pages 34 to 37)

DEPOSITION OF ALICIA YOLANDA ALFRED
Conducted on August 29, 2007

Page 38

1    The officers said they had to investigate
2    before they released me to verify before it was
3    resolved.
4    Q.  Approximately how long did the Arlington
5    police officers detain you?
6    A.  Over an hour.
7    Q.  This started at approximately 11:00 and it
8    was after 12:00 when they finished?
9    A.  Yes, almost two hours actually, yes.
10   Q.  When it ended, what had they ascertained?
11   A.  They ascertained, quote, if I want to
12   blame someone for the ordeal, I need to blame this
13   guy Officer Fanone, the card in their hand, and
14   they said he was, he should have taken you out of
15   the system when he gave you your car back, this is
16   what we expect out of D.C. cops anyway.
17       That was pretty much what he said and
18   stated that if I needed them to verify or vouch for
19   what happened, what went down, they gave me their
20   badge numbers and their identification to state my
21   car was still listed as stolen in the system.

Page 39

1    Q.  Which officers held the guns on you ---
2    D.C. or Arlington?
3    A.  Which officers held guns --- the Arlington
4    officers arrested me.
5    Q.  Which officers detained you from 11:00 to
6    12:00, D.C. or Arlington?
7    A.  11:00 or 12:00, I was in Arlington, 26
8    April.
9    Q.  The officers were Arlington officers?
10   A.  Yes.
11   Q.  When did you purchase the LoJack?
12   A.  Same day I got the car.
13   Q.  What year?
14   A.  As I stated before, I purchased the car in
15   2003.
16   Q.  Do you recall in what month?
17   A.  No.
18   Q.  Where did you purchase your car?
19   A.  In Virginia, I can't recall the name of
20   the dealership.
21   Q.  What town?

Page 40

1    A.  I don't know the county or the town, I can
2    guess, but that might not be the actual county or
3    town.
4    MS. MCQUINN:  I will have this marked for
5    motion to compel --- that she will let us know
6    where she bought her car.
7    THE WITNESS:  I have that, no problem.
8    BY MS. MCQUINN:
9    Q.  Give that to your attorney to give it to
10   me.
11   A.  No problem.
12   Q.  You were supposed to have everything by 24
13   of August.
14       I will hand you what has been marked
15   Number 6.  It is part of an exhibit, part of a
16   prior motion for summary judgment, special order
17   96.1 A regarding the LoJack pilot system, the
18   information on the first page, at the bottom about
19   the purpose of such systems.
20       Look at that paragraph, I want to know ---
21       MR. BELL:  Objection.  What is this

Page 41

1    document?  This is a summary of Lojack's motion,
2    the motion for summary judgment for LoJack.
3    BY MS. MCQUINN:
4    Q.  Look at the last paragraph on that page
5    about the way is LoJack is purchased and I want you
6    to read that for me, not out loud.
7    MR. BELL:  Objection, you haven't asked
8    her whether she has seen the document.
9    MS. MCQUINN:  She doesn't have to have
10   seen every document.
11   MR. BELL:  If you are asking about the
12   document.
13   MS. MCQUINN:  I haven't asked a question.
14   MR. BELL:  Special order.
15   MS. MCQUINN:  I haven't asked a question.
16   MR. BELL:  Ask.
17   BY MS. MCQUINN:
18   Q.  Look at the bottom paragraph.
19   A.  I already did.
20   Q.  It states here there are various ways to
21   purchase a LoJack system and some ways ---

11 (Pages 38 to 41)

DEPOSITION OF ALICIA YOLANDA ALFRED
Conducted on August 29, 2007

Page 42

1    A. I will take your word for it.
2    Q. It is in this paragraph.
3    A. I take your word for it.
4    Q. I am trying, since you haven't told me
5  where you purchased it.
6    A. But, you know, where doesn't mean, I don't
7  know where I purchased it, I know I purchased it, I
8  told you, I told you I purchased it when I
9  purchased the car at the dealership.
10   Q. Did you get it from a dealership?
11      Do you know whether or not the specific
12 dealer installed your LoJack or was it done outside
13 of that dealership?
14   A. I have no idea as far as their procedure
15 who would install the LoJack. You need to contact
16 them.
17   Q. Ms. Alfred?
18   A. Could have been them, could not.
19   Q. You, I am asking you.
20   A. You were asking for information I do not
21 have or would not be privy to know who exactly

Page 43

1  installed it.
2      I purchased it from them, I imagine they
3  would have a LoJack technician install it.
4    Q. You response is you don't know whether or
5  not your dealership did it or?
6    A. My LoJack system was working perfectly
7  fine.
8      MR. BELL: Answer the question.
9      Do you know, yes or no.
10     THE WITNESS: No. Okay.
11     BY MS. MCQUINN:
12   Q. I showed you earlier Exhibits 1A and 1B.
13 We asked that you bring certain documents with you
14 by the interrogatories and the notice of
15 deposition.
16     Did you bring the documentation you
17 received when you purchased your LoJack system?
18   A. Did I bring documentation?
19   Q. Right.
20   A. No, I can call the LoJack office and see
21 if they can send me some kind of confirmation the

Page 44

1  system was purchased.
2      Because they are still providing service
3  to me, that should be sufficient evidence,
4  sufficient to say I am a customer.
5    Q. Are you going to try and get that
6  information?
7      MR. BELL: You are asking her to violate a
8  court order of July 3 and she will not do that.
9      MS. MCQUINN: Mark that for motion to
10 compel.
11     MR. BELL: She will not violate the order.
12 I will make my record. This is --- a judge in this
13 case, July 3, specifically stated that neither
14 party can request any type of discovery from
15 LoJack.
16     I will not allow my client to violate the
17 judge's order.
18     BY MS. MCQUINN:
19   Q. My question is: Did you bring with you
20 any document from the purchase of your LoJack
21 system?

Page 45

1    A. You asked me.
2    Q. I am asking again.
3    A. I have to answer twice?
4    Q. Yes.
5    A. Same answer.
6    Q. Which is?
7    A. As I stated.
8    Q. Did you bring any document with you?
9    A. No, I did not bring any documentation that
10 says it is a contract between me and LoJack.
11   Q. My question was any documentation
12 regarding your purchase.
13   A. I purchased the car.
14   Q. Purchase of LoJack, whether it be a
15 contract, sales receipt, documentation on how it is
16 going to be installed, any type of documentation
17 you received at the time you purchased LoJack, did
18 you bring any of that with you?
19   A. I did not bring any LoJack documentation
20 with me.
21     MS. MCQUINN: Mark that for motion to

12 (Pages 42 to 45)

DEPOSITION OF ALICIA YOLANDA ALFRED
Conducted on August 29, 2007

Page 46

1    compel, please.
2         BY MS. MCQUINN:
3    Q.  I want you to look at Exhibit 7,
4    information on how the LoJack is set up.
5         Look at the bottom of the page, last two
6    paragraphs.
7         Tell me if your system encompassed any of
8    that in there.
9    A.  I don't know --- extended recovery
10   warranty, guarantee plus 5,000, my answer is I
11   don't know.
12   Q.  You don't know if you purchased that?
13   A.  I don't know.
14   Q.  You say I don't know, what is, what are
15   you talking about?
16   A.  The answer to your question is I don't
17   know.
18   Q.  The reason I am continuing to ask you is
19   because you don't let me finish the question, so
20   there is no way to figure it out.
21        Try letting me finish my sentence.

Page 47

1    A.  Okay.
2    Q.  You have answered me in the middle of a
3    sentence two or three times.  Wait for me to
4    finish.
5    A.  Sure.
6    Q.  At the time you made your purchase, you
7    don't know whether or not you got the extended
8    warranty or guarantee plus 5,000, the bottom of the
9    page, Exhibit 7?
10   A.  Yes.
11   Q.  You don't know if you got it?
12   A.  Yes.
13   Q.  Yes, you got it?
14        Or yes, you don't know if you bought it?
15   A.  I am answering, I am answering your
16   question.
17   Q.  Did you purchase an extended warranty?
18   A.  I don't know.
19   Q.  Did you purchase the guarantee plus 5,000?
20   A.  I don't know.
21   Q.  Did you purchase, still looking at Exhibit

Page 48

1    7, did you purchase the LoJack early warning
2    recovery system that lets you know if someone is
3    moving your vehicles without permission?
4    A.  I don't know.
5    Q.  On the morning you got up and noticed your
6    car was gone, what places did you call the minute
7    you noticed it was gone?
8    A.  I had to call the police department in my
9    county.
10   Q.  That is the only place you called?
11   A.  As far as?
12   Q.  Is that the only place you called
13   regarding your car being missing?
14   A.  No, I called LoJack.
15   Q.  Prince George's County police?  You said
16   in my county?
17   A.  I said my county, Prince George's County
18   Police Department.
19   Q.  Do you recall the name of the sales person
20   from whom you purchased your car?
21   A.  Do I recall the sales person at the

Page 49

1    dealership?
2    Q.  Right.
3    A.  No.
4    Q.  Was it a male or female?
5    A.  It was a male.
6    Q.  I am looking at page 3 of your answers to
7    interrogatories, the paragraph in the middle of the
8    page because of Officer Fanone's negligence, what
9    is negligence?
10   A.  Do you want me to define the word?
11   Q.  Did you provide an answer?
12   A.  It is military, okay.
13   Q.  I need you to listen.
14   A.  Okay, can I have a moment.
15   Q.  The question is --
16   A.  I understand the question.
17        Officer Fanone failed to do his job.  He
18   was negligent because of what he did not do.  He
19   did not call in, I asked him specifically am I okay
20   to drive, am I okay, I am a woman in a Jaguar,
21   driving in Virginia, the car is listed as stolen.

13  (Pages 46 to 49)

DEPOSITION OF ALICIA YOLANDA ALFRED
Conducted on August 29, 2007

Page 50

1    Because he did not do his job I am
2 handcuffed in front of my job and arrested.
3    You are asking me to define negligence, he
4 failed to do his job, failed to put it in the
5 system, it didn't take but a five-minute phone
6 call.
7    Arlington waited, I had to wait 20 minutes
8 for them to make sure, they contacted someone
9 somewhere until they were sure it was out of the
10 system. He failed to do that.
11    Q.  Did you provide that answer or your
12 attorney?
13    A.  Everything here I provided, I provided
14 everything in this booklet, all my answers.
15    Q.  Pass it to me.
16    A.  I have a college degree, I know what the
17 word negligence means.
18    Q.  Is that how you talked to the Arlington
19 police officers?
20    A.  I need a moment.
21    Q.  Is that the attitude you had with the

Page 51

1 Arlington police officers?
2    A.  Is that a rhetorical question?
3    Q.  No, it is a question.
4    A.  Read my card, you will know how I acted in
5 front of the Arlington police officers.
6    Better yet, you can ask them. You can
7 call them, I have their badge numbers and you can
8 ask them to define negligence.
9    Q.  Look at page 8, response number 17.
10    A.  Are those all my copies?
11    Q.  These are not for you. Your attorney has
12 a set of documents that can go with you when you
13 leave.
14    A.  Okay, I wanted to make sure.
15    Q.  Look at page 8, response number 17.
16    A.  Response number 17.
17    Q.  Right.
18    (Pause in the proceedings.)
19    THE WITNESS: If the plaintiff.
20    BY MS. MCQUINN:
21    Q.  Read it to yourself.

Page 52

1    What was the dispute with your neighbor
2 about?
3    MR. BELL: Objection.
4    You can answer.
5    THE WITNESS: It was just a dispute and we
6 were both arrested. The case was no paper.
7    Q.  What was the dispute with your neighbor
8 about?
9    MR. BELL: Objection.
10    THE WITNESS: I don't recall.
11    BY MS. MCQUINN:
12    Q.  What was the reason for your arrest?
13    MR. BELL: Objection.
14    THE WITNESS: I don't recall.
15    BY MS. MCQUINN:
16    Q.  In what year did that dispute occur?
17    MR. BELL: Objection.
18    THE WITNESS: 2007.
19    BY MS. MCQUINN:
20    Q.  What month, approximately?
21    MR. BELL: Objection.

Page 53

1    THE WITNESS: Earlier this year.
2    BY MS. MCQUINN:
3    Q.  You don't recall the month?
4    A.  No.
5    Q.  What was the neighbor's name?
6    MR. BELL: Objection.
7    THE WITNESS: I don't recall.
8    BY MS. MCQUINN:
9    Q.  What was the neighbor's address?
10    MR. BELL: Objection.
11    THE WITNESS: 2220 North Capitol Street.
12    BY MS. MCQUINN:
13    Q.  What city?
14    A.  Washington.
15    Q.  When you were arrested, were you taken
16 away from the home?
17    MR. BELL: Objection.
18    THE WITNESS: I was arrested.
19    BY MS. MCQUINN:
20    Q.  And you were taken to jail?
21    MR. BELL: Objection.

14  (Pages 50 to 53)

DEPOSITION OF ALICIA YOLANDA ALFRED
Conducted on August 29, 2007

Page 54

1    THE WITNESS: That is the only way you get
2  arrested.
3       BY MS. MCQUINN:
4    Q.  I would like to know where you were taken.
5       MR. BELL: Objection.
6       THE WITNESS: I don't understand.
7       BY MS. MCQUINN:
8    Q.  Were you taken to jail?
9    A.  Yeah.
10      MR. BELL: Objection.
11      BY MS. MCQUINN:
12   Q.  How long were you there?
13   A.  I guess eight hours.
14   Q.  Were the two of you physically fighting?
15      MR. BELL: Objection.
16      THE WITNESS: No.
17      BY MS. MCQUINN:
18   Q.  Was it disorderly conduct?
19      MR. BELL: Objection.
20      THE WITNESS: I don't recall.
21      BY MS. MCQUINN:

Page 55

1    Q.  You don't recall what you were arguing
2  about?
3       MR. BELL: Objection.
4       THE WITNESS: No.
5       BY MS. MCQUINN:
6    Q.  How did you get out of jail?
7       MR. BELL: Objection.
8       THE WITNESS: What do you mean? I walked
9  out.
10      BY MS. MCQUINN:
11   Q.  Did someone have to come and bail you out?
12      MR. BELL: Objection.
13      You can answer.
14      THE WITNESS: No, there was no case, it
15  was dismissed, I guess, dismissed.
16      BY MS. MCQUINN:
17   Q.  This is deposition Exhibit 8, it is an
18  affidavit of a man from LoJack describing how the
19  system works.
20      Take a look at that for a minute. Read it
21  to yourself.

Page 56

1    A.  Okay, okay.
2    Q.  Not the whole thing, after the first page
3  or two, that tells how the system works.
4    A.  Okay.
5    Q.  What is your understanding of how the
6  LoJack system works, how was it explained to you?
7    A.  It was explained to me on 25 of April that
8  once I reported the car stolen, police officers
9  would input it into NCIC system.
10      Once it was inputted into that and it was
11  transmitted or has been initiated, it will initiate
12  a signal to the police car it was a stolen vehicle.
13      When the car is recovered, the police
14  department or police agency or anything, federal
15  agency, not just the police, any law enforcement
16  agency can go in and turn the system, turn it off
17  out of NCIC.
18   Q.  On April 25 and 26 of 2005, did you know
19  the race of any Metropolitan Police Department
20  teletype or communications individuals?
21   A.  Race of?

Page 57

1    Q.  Any Metropolitan Police Department
2  teletype or communications individuals?
3    A.  Officers, I know the officers that
4  recovered my car, I know their race.
5    Q.  Do you want her to read the question back?
6       MR. BELL: Answer her specific question,
7  the teletype people.
8       BY MS. MCQUINN:
9    Q.  Or communications people, the Metropolitan
10  Police Department, did you know the race of any of
11  them?
12      MR. BELL: Teletype people or
13  communications people that is for Metropolitan
14  Police Department, did you know their race?
15      THE WITNESS: No, I thought ---
16      MR. BELL: Just answer her question.
17      BY MS. MCQUINN:
18   Q.  Your answer indicated at least $3,000 so
19  far in expenses for your attorney.
20      What other expenses do you attribute to
21  the incident of April 25, 26, 2005?

15  (Pages 54 to 57)

DEPOSITION OF ALICIA YOLANDA ALFRED
Conducted on August 29, 2007

Page 58

1    A. Other than legal fees, just legal fee.

2    Q. Is that the $3,000?

3        Your answers to interrogatories indicate

4   $3,000, that those are your damages at this point.

5    A. Yes.

6        MS. MCQUINN: I have nothing further at

7   this time.

8        MR. STEPHENS: No questions.

9        EXAMINATION BY COUNSEL FOR PLAINTIFF

10       BY MR. BELL:

11   Q. I have a couple of, let me clarify two

12   things.

13       Defense counsel asked you had you bought

14   any LoJack documents, brought any LoJack documents

15   to this deposition. Do you remember that?

16   A. Yes.

17   Q. Do you have any LoJack documents in your

18   possession, at all?

19   A. No.

20   Q. When is the last time you have seen

21   documents from LoJack?

Page 59

1    A. Four years ago when I purchased the car.

2    Q. Defense counsel asked you two questions

3   back to back. The first question was she asked you

4   about your expenses and she said it stated in your

5   interrogatories you put down $3,000, do you recall

6   that?

7    A. Yes.

8    Q. The next question she asked you was: Was

9   that all of your damages.

10       Do you remember that question?

11   A. Yes.

12   Q. Tell me how did the incident affect you at

13   your job?

14   A. The rumors started spreading about I had

15   done some type of illegal action or some type of

16   illegal affiliation to get my car or something or I

17   was being arrested and I was humiliated,

18   embarrassed by the fact that my leadership had to

19   send out two emails to calm everything down, calm

20   the rumors down, and it was just degrading, the

21   experience was very degrading.

Page 60

1    Q. Is that part of your damages that you are

2   seeking?

3    A. Yes.

4        MR. BELL: I have nothing further.

5        EXAMINATION BY COUNSEL FOR DEFENDANTS

6        BY MS. MCQUINN:

7    Q. The emails that were sent by your office

8   were sent about Arlington police officers holding

9   you outside of your building?

10   A. I see it as it was a result of one officer

11   not reporting my car being recovered, had my car

12   been reported as recovered, nothing would have

13   happened on April 26.

14   Q. Did Officer Fanone hold a gun on you any

15   time?

16   A. Officer Fanone did something worse, he let

17   me drive around D.C. and Virginia in a stolen

18   vehicle, it was worse to me, because of that I

19   could have been killed, I could have been killed.

20   Q. Weren't you told you were still emitting

21   the signal?

Page 61

1    A. I was told afterwards I was still emitting

2   a signal, but it should be gone away shortly.

3        MS. MCQUINN: I have nothing further.

4        MR. BELL: Waive. I need a 24-hour

5   turnaround on this.

6        (Whereupon, at 11:50 a.m., the deposition

7   was adjourned.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

16  (Pages 58 to 61)

DEPOSITION OF ALICIA YOLANDA ALFRED
Conducted on August 29, 2007

Page 62

1      CERTIFICATE OF NOTARY PUBLIC
2      I, JONELL EASTON, the officer before whom the
3      foregoing deposition was taken, do hereby testify
4      that the witness whose testimony appears in the
5      foregoing deposition was duly sworn by me; that the
6      testimony of said witness was taken by me
7      stenographically and thereafter reduced to
8      typewriting under my direction; that said
9      deposition is a true and accurate record of the
10     testimony given by said witness; that I am neither
11     counsel for, related to, nor employed by any of the
12     parties to the action in which this deposition was
13     taken; and further, that I am not a relative or
14     employee of any attorney or counsel employed by the
15     parties hereto nor financially or otherwise
16     interested in the outcome of the action.
17          JONELL EASTON
18
19          Notary Public in and for the
20          District of Columbia
21     My Commission Expires:  March 31, 2009

17 (Page 62)

# ATTACHMENT 4

# ATTACHMENT 4

Page: 1 Document Name: untitled

ART/X84VPW/FL/05/PC/3

MISCELLANEOUS VEHICLE RECORD                IND= 04/26/05 INT= 12:29 WALES ONLY
EX   DCMPD00T1 X84VPW   FL 05 PC SAJDA01C1YFL44194 00 JAGU
        042605              INER MD REC 052761
   WIN/V0072389
FRM/700 BLK 14TH ST NW
LOT/RELEASE TO OWNER

WALES RECORD FOUND        *** NCIC QV MSG    #41904       SENT BY PD0557 ***
                          *** NLET RQ MSG    #41904       SENT BY PD0557 ***

*** NCIC RESPONSE #41904        RCVD FOR DCMPD00T1/T6VA/PD0557 ***


DCMPD00T1
MKE/LOCATED STOLEN VEHICLE
ORI/MD0172100 LIC/X84VPW LIS/FL LIY/2005 LIT/PC
VIN/SAJDA01C1YFL44194 VYR/2000
VMA/JAGU VST/4D VCC/BLK DOT/20050424
OCA/051150247 2005C126 DCMPD00T1 052761
NIC/V147366865 DTE/20050425 1743 EDT
ORI IS PRINCE GEORGES COUNTY POLICE DEPARTMENT 301 499-8113
IMMED CONFIRM RECORD WITH ORI

Date: 4/26/2005 Time: 12:34:01 PM

Page: 1 Document Name: untitled

ART/X84VPW/FL/05/PC/3

MISCELLANEOUS VEHICLE RECORD                    IND= 04/26/05 INT= 12:29 WALES ONLY
EX   DCMPD00T1 X84VPW   FL 05 PC SAJDA01C1YFL44194 00 JAGU
        042605                    INBR MD REC 052761
    WIN/V0072389
FRM/700 BLK 14TH ST NW
LOT/RELEASE TO OWNER

WALES RECORD FOUND       *** NCIC QV MSG   #41904       SENT BY PD0557 ***
                         *** NLET RQ MSG   #41904       SENT BY PD0557 ***

*** NCIC RESPONSE #41904       RCVD FOR DCMPD00T1/T6VA/PD0557 ***


DCMPD00T1
MKE/LOCATED STOLEN VEHICLE
ORI/MD0172100 LIC/X84VPW LIS/FL LIY/2005 LIT/PC
VIN/SAJDA01C1YFL44194 VYR/2000
VMA/JAGU VST/4D VCC/BLK DOT/20050424
OCA/051150247 2005C126 DCMPD00T1 052761
NIC/V147366865 DTE/20050425 1743 EDT
ORI IS PRINCE GEORGES COUNTY POLICE DEPARTMENT 301 499-8113
IMMED CONFIRM RECORD WITH ORI

Date: 4/26/2005 Time: 12:34:01 PM

Page: 1 Document Name: untitled

ART/X84VPW/FL/05/PC/3

MISCELLANEOUS VEHICLE RECORD              IND= 04/26/05 INT= 12:29 WALES ONLY
EX   DCMPD00T1 X84VPW   FL 05 PC SAJDA01C1YFL44194 00 JAGU
        042605              INER MD REC 052761
   WIN/V0072389
FRM/700 BLK 14TH ST NW
LOT/RELEASE TO OWNER

WALES RECORD FOUND       *** NCIC QV MSG    #41904        SENT BY PD0557 ***
                         *** NLET RQ MSG    #41904        SENT BY PD0557 ***

*** NCIC RESPONSE #41904       RCVD FOR DCMPD00T1/T6VA/PD0557 ***


DCMPD00T1
MKE/LOCATED STOLEN VEHICLE
ORI/MD0172100 LIC/X84VPW LIS/FL LIY/2005 LIT/PC
VIN/SAJDA01C1YFL44194 VYR/2000
VMA/JAGU VST/4D VCC/BLK DOT/20050424
OCA/051150247 20050426 DCMPD00T1 052761
NIC/V147366865 DTE/20050425 1743 EDT
ORI IS PRINCE GEORGES COUNTY POLICE DEPARTMENT 301 499-8113
IMMED CONFIRM RECORD WITH ORI

Date: 4/26/2005 Time: 12:34:01 PM

Page: 1 Document Name: untitled

ART/X84VPW/FL/05/PC/3

MISCELLANEOUS VEHICLE RECORD
EX    DCMPD00T1 X84VPW          FL 05 PC SAJDA01C1YFL44194 00 JAGU          IND= 04/26/05 INT= 12:29 WALES ONLY
      042605                  INER MD REC 052761
    WIN/V0072389
FRM/700 BLK 14TH ST NW
LOT/RELEASE TO OWNER

WALES RECORD FOUND          *** NCIC QV MSG     #41904          SENT BY PD0557 ***
                           *** NLET RQ MSG     #41904          SENT BY PD0557 ***

    *** NCIC RESPONSE #41904          RCVD FOR DCMPD00T1/T6VA/PD0557 ***


DCMPD00T1
MKE/LOCATED STOLEN VEHICLE
ORI/MD0172100 LIC/X84VPW LIS/FL LIY/2005 LIT/PC
VIN/SAJDA01C1YFL44194 VYR/2000
VMA/JAGU VST/4D VCC/BLK DOT/20050424
OCA/051150247 20050426 DCMPD00T1 052761
NIC/V147366865 DTE/20050425 1743 EDT
ORI IS PRINCE GEORGES COUNTY POLICE DEPARTMENT 301 499-8113
IMMED CONFIRM RECORD WITH ORI

# ATTACHMENT 5

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ALICIA Y. ALFRED,

                Plaintiff,

     v.

DISTRICT OF COLUMBIA,

                Defendant &
                Third Party Plaintiff,

     v.

THE LOJACK COMPANY, *et al.*,

                Third Party Defendants.

Civil Action No. 05-1446 (PLF)

## AFFIDAVIT OF SERGEANT IRVING CURRY

District of Columbia, ss:

1.     I am **SERGEANT IRVING CURRY**, Director of Teletype, a division of the District of Columbia Metropolitan Police Department.   I have been the director of that office since on or about October 15, 2006.

2.     As such, I am familiar with the process of reporting stolen vehicles and of reporting their recovery.

3.     The MPD Communications dispatcher informs the recovering officer over the radio whether the original report of the stolen vehicle is local or interstate. "Local" means that the vehicle was stolen in the District of Columbia and "interstate" means that the vehicle was stolen in a jurisdiction outside of the

District of Columbia. The officer then either has the vehicle towed or released to the owner.

4.    Thereafter, the recovering officer notifies Teletype by telephone of the facts surrounding the recovery of the vehicle, such as the type of vehicle, the make and model, the tag number, whether any arrests were made on the scene, whether the owner was notified and took possession of the vehicle, or whether the vehicle was towed, towed by whom and to where. Teletype does not record the vehicle owner's race. It is not the customary practice of Teletype to record or to make a record of such telephone calls from reporting officers. Teletype then enters the information provided into the National Crime Information Center ("NCIC") and Washington Area Law Enforcement System ("WALES") computer system and waits for a return message from the originating jurisdiction, here Prince Georges County. Prince Georges County is considered the originating agency because that is where Alicia Y. Alfred, the plaintiff in this case, reported that her vehicle was stolen.

5.    Within one hour of having been notified of the recovery, Prince Georges County must notify NCIC and WALES of the recovery. If there is no response in one hour, Teletype sends the message again, and waits another hour. If the originating agency never responds after the second notification, a third message is then sent, which triggers an automatic notice to the FBI of the non-responsiveness. The FBI then would contact the originating agency, Prince Georges County, directly.

6.  Through the NCIC and WALES system, the originating jurisdiction, Prince Georges County was notified in this case of the recovery. Because Prince Georges County, was the agency which put the vehicle into NCIC and WALES when plaintiff first reported it stolen, then Prince Georges County had to be the agency that took the vehicle out of the system by noting its recovery into NCIC and WALES.

7.  The Net Law Enforcement Telecommunications System ("NLETS") is the electronic communications system between Teletype and other jurisdictions, including Prince Georges County. Such communications are not automatically recorded or stored in an electronic folder. It is customary for the Teletype operator to print the NLETS depicted on the screen as the inquiries are being made and to save the printed hard copies. Although I searched, such hard copies have not been located in this case.

8.  In this particular case, the plaintiff reported the theft of her vehicle to the Prince Georges County Police, which entered it into NCIC and WALES as "stolen."

9.  It is the responsibility of the issuing agency where the vehicle was stolen to take that information out of NCIC and WALES by reporting that the vehicle has been recovered.

10. Here, it was the responsibility of the Prince Georges County Police Department to notify NCIC and WALES that the plaintiff's vehicle had been recovered on April 25, 2005.

3

11.     Once the Prince Georges County Police Department notified WALES and NCIC

of the recovery of plaintiff's vehicle, it was then the responsibility of the

LoJack Company to turn off the emitting signal on the plaintiff's vehicle.


**SERGEANT IRVING CURRY**
**Director, Teletype**
**D.C. Metropolitan Police Department**


Subscribed and sworn to before me this ____*31*____ day of ____*MAY*____ 2007.

My commission expires: ____*MARCH 31, 2010*____.


JULIA JOHNSON
NOTARY PUBLIC DISTRICT OF COLUMBIA
My Commission Expires March 31, 2010

*NOTARY Public*

4

# ATTACHMENT 6

May-24-2007  05:19pm   From-                                    T-176  P.002    F-601

# NCIC 2000
# Operating Manual

December 1999

*Notice to Control Terminal Officers (CTOs)*:  This *NCIC 2000 Operating Manual* is available on
Law Enforcement OnLine (LEO).  For information concerning a LEO account, please contact:  LEO
Program Office, FBI CJIS Division, Room 11255, 935 Pennsylvania Avenue, N.W., Washington, D.C.
20535-0001  telephone: 202-324-8833.

*Notice to Terminal Agency Coordinators*:  Requests for additional copies of the *NCIC 2000 Operating
Manual* should be directed to the state CTO.

*CANCELLATION*

## SECTION 4--CANCELLATION

**4.1     WHEN TO USE A CANCELLATION MESSAGE**

Cancellation of a record is restricted to the agency that entered the record. A cancellation message is used when the entering agency determines that the record is invalid, for example, a record that resulted from a fictitious or false theft report. Any add-on vehicle or add-on part appended to a base vehicle record will be canceled when the base record is canceled. If the add-on vehicle or part has not been recovered with the vehicle, the stolen vehicle or part should be reentered as a base record.

The MKE XV must be used to cancel a stolen vehicle record; the MKE XF must be used to cancel a felony vehicle record.

**4.2     EXAMPLE OF A CANCELLATION MESSAGE**

1N01HEADER.XV.MD1012600.NIC/V000032699.OCA/A222.19991205.NOT STOLEN

**Acknowledgment:**

1L01HEADER
MD1012600
CANCEL NIC/V000032699

The above cancellation example contains: header (1N01HEADER), message key (XV), Originating Agency Identifier (MD1012600), two record identifiers (NIC/V000032699 and OCA/A222), date of cancellation (19991205), and reason for property record removal (NOT STOLEN).

When a vehicle record is canceled, the entire record including all data appended to the record by means of an add-on record entry is automatically canceled.

**4.3     MESSAGE FIELD CODES FOR CANCELLATION**

| FIELD NAME | REQUIREMENTS | MESSAGE FIELD CODE | FIELD LENGTH | DATA TYPE |
|---|---|---|---|---|
| HEADER | MANDATORY | HDR | 9-19 | ALPHABETIC, NUMERIC, SPECIAL CHARACTERS |
| MESSAGE KEY | MANDATORY | MKE | 2-2 | ALPHABETIC |
| ORIGINATING AGENCY IDENTIFIER | MANDATORY | ORI | 9-9 | ALPHABETIC, NUMERIC |
| NCIC NUMBER | CONDITIONAL | NIC | 10-10 | ALPHABETIC, NUMERIC |

May-24-2007 05:19pm  From-                          T-176  P.004   F-601

another computer search is automatically generated on the VIN contained in the record response. The automatic second search may retrieve up to 15 records from the Vehicle, Boat, Vehicle/Boat Part Files and/or person files if they contain a matching VIN, SER, or OAN, regardless of the LIC data used in the original inquiry.

4.   If the initial inquiry on license plate data retrieves 1) a person record with identical license data, a second search will be performed on the base VIN (or the oldest supplemental VIN if there is no base VIN), the base SOC, or the FBI number; 2) a Vehicle or Boat File record with add-on entries, a second search will be performed on the VIN contained in the add-on entry that has matching license data.

5.   An inquiry containing VIN or LIC can provide a secondary hit response from the NCIC 2000 person files when the primary hit contains a SOC or FBI number. When this happens, another search is automatically generated on the SOC and/or FBI number contained in the record response. The automatic second search may retrieve up to 15 matches of each from the person files for SOC or FBI number regardless of the VIN or LIC data used in the original inquiry

## 5.5   ADDITIONAL GUIDELINES FOR NCIC 2000 INQUIRY

1.   IMAGE INDICATOR (IND)

Inquiries submitted in an NCIC 2000 format may contain an Image Indicator (IND) to specify whether an image should be returned if available. If the IND is Y, an image related to each primary hit response, if available, will be returned (i.e., one identifying image for a vehicle record, one mugshot for a person record). If IND is not entered, the field will default to an N.

```
1N01HEADER.QV.WA1230000.LIC/ABC123.LIS/MD.VIN/2P4555P026483.
VMA/PONT.IND/Y.
```

The following would be returned after the immediate confirm caveat for a generic vehicle image:

```
IMR/VVMO:BON VST:SW
VYR:1995 VMA:PONT
IMN:I000001222 GENERIC VEHICLE           00256
<image>.
```

The Image Response (IMR) is composed of the following data: IMT (V for generic image) and standard vehicle MFCs (VST , VYR , and VMA). The IMN is next, followed by the image description (GENERIC VEHICLE). Following is the image size in bytes (00256), and, last, the <image> would be replaced with the actual image.

*INQUIRY*

The following would be returned after the immediate confirm caveat for an identifying vehicle image:

```
IMI./IVIN:2P4555P026483 LIC:ABC123 LIS:MD
VYR:1995 VMA:PONT
NIC:V000032699 IMN:I000031222          00512
<image>.
```

The Image Response (IMR) is composed of the following data: IMT (I for identifying image) and standard vehicle MFCs (LIC, LIS, VYR, and VMA). The NIC of the base record is next, followed by the IMN. Following the IMN is the image size in bytes (00512) and, last, the <image> would be replaced with the actual image.

2.    RELATED SEARCH HIT (RSH)

Inquiries may also contain a RSH Field. If the RSH is Y, secondary hit responses will be returned for all records with the same ORI/OCA as the primary hit response and all records linked by the LKI/LKA contained in the primary hit response.

If the hit response contains more than ten secondary hit responses, the following will be included in the response to indicate a file is being created with the additional hits.

```
ADDITIONAL HITS AVAILABLE, FILE NOTIFICATION TO FOLLOW
```

A $B. will then be sent to the ORI to identify the file name to be requested to retrieve the additional hit responses. The File Transfer (FT) transaction in the Other Transactions chapter of this manual contains additional information on retrieving the file.

**5.6    BATCH INQUIRY (QVB)**

1.    The NCIC 2000 batch inquiry allows users to create a file of individual QV/ZV inquiries in one message. Each inquiry is delimited by a sequence number (SEQ) at the beginning of the inquiry and an "&" as a separator. The SEQ is three numerics and is used to match the responses (hit or no hit) to the specific inquiry from which they were generated. Prior to each response SEQUENCE NUMBER: <SEQ> will be returned to identify those responses that follow as coming from the inquiry with that sequence number. For example:

```
1N01HEADER.QVB.DC1014300.001.VIN/WG723K1K6E76543216002.LIC/ABC123.
LIS/MD.VIN/2P4555PO26836005.VIN/1K742B2GOD54321234010.NIC/V123456789
```

Acknowledgment:

```
1101HEADER
DC1014300
BATCH INQUIRY RECEIVED
```

2.   The sequence numbers, as shown in the example, do not have to be sequential (001, 002, 005, 010), but they have to be unique. The HDR, ORI, MKE, and sequence number are entered without the MFC. The identifiers available in the QV/ZV inquiry are available for use in the QVB message, including the IND and the RSH indicators, and are preceded by the proper MFC.

3.   There is a limit of 1800 characters for a batch inquiry, including the header and all control characters.

4.   The user is notified of a file by the $.B. administrative message. The results of the batch must be retrieved by the user via a File Transfer (FT) message. The following is an example of the contents of a file:

```
1L01HEADER
DC.014300

SEQUENCE NUMBER: 001
NO RECORD VIN/WG723K1K6E7654321

SEQUENCE NUMBER: 002

MKE/STOLEN VEHICLE
ORI/MD1012600 LIC/ABC123 LIS/MD LIY/1999 LIT/PC
VIN/2P4555PO2683 VYR/1996
VMA/FORD VMO/MUS VST/2D VCO/BLU DOT/20000110
OCA/ABC123
MIS/DENT IN LEFT REAR FENDER
OAN/0192837465VA
NIC/V723005317 DTE/20000112 1400 EST
ORI IS ANY CITY PD MD 301 555-1212
IMMED CONFIRM RECORD WITH ORI

SEQUENCE NUMBER: 005

NO RECORD VIN/1K742B2GOD5432123

***VERIFY VIN/1K742B2GOD5432123; IT DOES NOT CONFORM TO
      VIN STANDARDS FOR 1981 AND LATER VEHICLES.

SEQUENCE NUMBER: 010

NO RECORD NIC/V123456789
```

## 5.7   PROCEDURES FOR HANDLING A HIT

1.   An NCIC 2000 hit may not be probable cause to arrest. However, a hit confirmed with the ORI may be adequate grounds to take possession of a vehicle.

2.   When an agency receives a record(s) in response to an NCIC 2000 inquiry, and the whereabouts of the stolen vehicle inquired upon is known, and the vehicle inquired

May-24-2007  05:19pm  From-                                T-176  P.007/015  F-601

up:n appears to be identical with one or more of the records, the agency that can seize the stolen vehicle must contact the ORI of each record(s) to confirm the hit(s) prior to seizing the vehicle.

3.      "To confirm the hit" means to verify that the theft report is still outstanding, to verify that the vehicle inquired upon is identical to the vehicle in the record, and to obtain information concerning the return of the vehicle to the rightful owner.

4.      Standard hit confirmation procedures should be followed when a hit is received on a record for a vehicle subject to seizure. When the vehicle is located within the United States, the law enforcement officer should take possession of the vehicle. The officer must also contact either the entering agency or the office of the United States Marshals Service to execute the seizure order. When the vehicle is located outside of the United States, the law enforcement officer should contact the entering agency to determine if that agency will retrieve the vehicle.

5.      This system is based on two levels of priority: urgent and routine, with a different response time governing each level. Hit confirmation procedures are detailed in the Introduction chapter of this manual.

## 5.8    CANADIAN VEHICLE INDEX INFORMATION

1.      NCIC 2000 maintains an interface with the Canadian Police Information Centre (CPIC) that allows searchable identifiers in CPIC records to be transmitted to NCIC 2000 for storage and access, creating the Canadian Vehicle Index (CVI). The CVI contains stolen boat, part, vehicle, and license plate records, including U.S. registered vehicles and boats stolen in Canada. As with other NCIC 2000 responses, positive record responses must be confirmed with the originating agency.

2.      Certain CPIC message fields and codes do not conform to NCIC 2000 formats; therefore, those specific fields will be omitted or adjusted where applicable. All inquiries that search the Vehicle File may generate responses from the CVI. A CVI record includes the following caveats:  STOLEN VEHICLE IN CANADA; or FELONY VEHICLE IN CANADA; or STOLEN PART IN CANADA; etc.

**Positive Response:**

```
1L01HEADER
MD.012600

RECORD NIC/R723005317 IS A CANADIAN VEHICLE INDEX RECORD
CONFIRM RECORD WITH ORI

MKE/STOLEN VEHICLE IN CANADA
ORI/MB1012600 LIC/ABC123 LIS/ON LIY/1999 LIT/PC
VIN/WG723K1K6E7654321 VYR/1996
VMA/FORD
```

May-24-2007  05:19pm  From-                                    T-176  P.008/015  F-601

*INQUIRY*

```
OCA/ONDRE1234 CDE/19980110
NIC/R723005317 DTE/19980129 0000 EST
ORI IS ANYCITY, NAME OF PROVINCE, CANADA 333 555-1234
REPEAT - THIS IS A CANADIAN RECORD - CONFIRM WITH THE
ORIGINATING AGENCY IN CANADA
```

3.   A positive record response from the CVI must be confirmed with the Canadian
     Originating Agency as indicated in the record response. Canadian agency names,
     addresses, and telephone numbers can be obtained through a QO inquiry. For
     additional details, the inquiring agency can conduct an inquiry (QV) of the CPIC
     Vehicle Files utilizing the National Law Enforcement Telecommunications System,
     Inc.

*LOCATE*

## SECTION 6—LOCATE

### 6.1   WHEN TO USE A LOCATE MESSAGE

1.   Any agency, except the agency that entered the record, that recovers a vehicle which is indexed in NCIC 2000 must place a locate message on the active vehicle record(s). When an agency receives a record or multiple records in response to an inquiry, the agency that can seize the stolen vehicle must contact the ORI of each record possibly identical with the vehicle in question to confirm the hit. Following confirmation with the originating agency, a locate message must be transmitted for each record on file for the vehicle.

2.   The MKE LV should be used for locating a stolen vehicle record; the MKE LF for locating a felony vehicle record.

3.   Once a Vehicle File record has had a locate placed on it, it cannot be modified.

### 6.2   EXAMPLE OF A LOCATE MESSAGE

```
1N01HEADER.LV.WA1230000.NIC/V000032699.OCA/2325.19991205.5865.
HIT NCIC 19991204...10000.4000.9000
```

**Acknowledgment:**

```
1L01HEADER
WA1230000
LOCATE NIC/V000032699
```

The above locate example contains: header (1N01HEADER), message key (LV), recovering agency identifier (WA1230000), two record identifiers (NIC/V000032699 and OCA/2325), date of recovery (19991205), recovering agency case number (5865), and benefits and effectiveness data:  reason for property record removal (HIT NCIC 19991204), value of property recovered (10000), value of other recovered property (4000), and value of recovered contraband (9000).

When a locate message is transmitted for a Vehicle File record, the message key translation changes from STOLEN VEHICLE to LOCATED STOLEN VEHICLE, or from FELONY VEHICLE to LOCATED FELONY VEHICLE, and the date of recovery, recovering agency ORI, and recovering agency OCA are added to the record.

May-24-2007  05:20pm  From-                                    T-176  P.010/015  F-601

## SECTION 7–CLEAR

**7.1    WHEN TO USE A CLEAR MESSAGE**

1.    Clearance of a record is restricted to the agency that entered the record.  A clear message is transmitted:

    1.    When the agency recovering the vehicle is the agency that entered the record.

    2.    When the agency that entered the record is officially advised that the vehicle has been recovered by another agency.

2.    Any add-on vehicle or add-on part appended to a base vehicle record will be cleared when the base record is cleared.  If the add-on vehicle or part has not been recovered, a record must be reentered for the unrecovered vehicle or part.

3.    The appropriate MKE must be used to clear a vehicle record.  MKE CV must be used to clear a stolen vehicle record; MKE CF must be used to clear a felony vehicle record.

**7.2    EXAMPLE OF A CLEAR MESSAGE**

```
1N01HEADER.CV.MD1012600.NIC/V000032699.OCA/A222.19991005.WA1230000.
5865.HIT NCIC 19991003.4..1500..1000
```

**Acknowledgment:**

```
1L01HEADER
MD1012600
CLEAR NIC/V000032699
```

The above clear example contains: header (1N01HEADER), message key (CV) Originating Agency Identifier (MD1012600), two record identifiers (NIC/V000032699 and OCA/A222), date of recovery (19991005), the recovering agency identifier (WA1230000), the recovering agency case number (5865), and benefits and effectiveness data:  reason for property record removal (HIT NCIC 19991003), number of persons apprehended (4), value of recovered property (1500), and value of recovered contraband (1000).

## 7.5    ADDITIONAL GUIDELINES FOR CLEAR

There are two circumstances that require unique record formats to clear a vehicle file record.

1.  If the agency that entered the record recovers the vehicle, only the date of recovery (which cannot be prior to the date of theft) must be entered following the two record identifiers. Additionally, benefits and effectiveness data should be included.

2.  If the vehicle file record is located by an agency other than the entering agency and:

    1.  The record being cleared is in a located status (MKE/LOCATED VEHICLE or MKE/LOCATED FELONY VEHICLE), only the date of clear would be entered following the two record identifiers.

    2.  The record being cleared is in an active status (MKE/STOLEN VEHICLE or MKE/FELONY VEHICLE), the date of clear followed by the recovering agency's identifier and the recovering agency's case number, in that order, without field codes would be entered after the two record identifiers. Additionally, benefits and effectiveness data should be included.

## 7.6    ADDITIONAL GUIDELINE FOR NCIC 2000 CLEAR

Following the date of recovery and recovering agency case number, users are expected to enter benefits and effectiveness data. The entry of benefits data is not MFC-dependent. Therefore, any field not entered should be accounted for with a period.

## 7.7    AUTOMATIC NOTIFICATION OF CLEAR

NCIC 2000 will automatically search the appropriate NCIC 2000 databases for duplicate vehicle records. If the VIN and VMA Fields of the record being cleared match another record or the LIC and either the LIS, LIY, or LIT match another record, a S.D. administrative message will be sent to the ORI of the duplicate record.

May-24-2007  05:20pm  From-                                    T-176  P.012/015  F-601

## SECTION 5--NCIC 2000 STANDARDS AND SANCTIONS

### 5.1     STANDARDS

The use of "effective communications" to help the criminal justice community perform its duties not only means providing access to and obtaining detailed information from pertinent computerized databases, but also includes the amount of time required to access the databases. While an entry, inquiry, or update message may contain specific and detailed information, the message (communication) could be very ineffective if it cannot be transmitted to the data center and a response cannot be received from the data center within a reasonable amount of time. It is not uncommon to hear of a hit occurring minutes after the record was entered. Restrictions have also been placed on the amount of time that a person may be detained while an inquiry is being made to determine whether a record is on file in a database. The rapid transmission of messages is extremely important, and standards were prepared to ensure that messages are transmitted and processed within a reasonable amount of time.

To ensure the integrity of the System, certain policies and standards must be completed, adopted, and followed. Through these policies and standards, a tool of measurement is provided against which the CJIS APB can measure the performance of the component parts of the System as a whole. These policies and standards also must address the specific areas of complaint of the "special" case situations.

### 5.2     STANDARDS FOR INQUIRY RESPONSE TIME - HOT FILES (NON-III) FOR SINGLE HIT/NO IMAGE RESPONSES

**High-Speed Line - Computer Interface**

1.     Average message response time for an inquiry from the CTA to NCIC 2000 and back to the CTA should not exceed 2 seconds.

2.     Average message response time from a CTA to an agency interfaced with the CTA should not exceed 12 seconds after transmission of the inquiry, with 2 of the 12 seconds allocated to the transmission to, processing by, and return of the response from NCIC 2000 as described in standard 1 above.

3.     Average message response time for an end-user terminal interfaced with a local/regional system which is interfaced with a CTA should not exceed 22 seconds after the transmission of the inquiry, with 12 of the 22 seconds allocated to the transmission to, processing by, and return of the response from the CTA and NCIC 2000 as described in standards 1 and 2 above.

4.     Average response time from any local/regional system or terminal interfaced directly with the NCIC 2000 computer (i.e., NCIC 2000 lines which terminate at an agency that is not a CTA) to an end-user terminal interfaced with the local/regional system

> Note: Average time should be based upon a compilation over a 28-day period. Abnormal operating times, such as during the installation of a new computer, should be excluded from the one-month compilation.

## 5.4    STANDARDS FOR RECORD ENTRY BY USER AGENCY

1.    Any agency having investigative authority and jurisdiction and having an FBI CJIS-assigned ORI must enter records into NCIC 2000 which meet NCIC 2000 criteria as soon as reasonably possible after the minimum data for entry is available.

2.    The CTA shall be responsible for assuring that every agency which has a terminal or access to a terminal by some interagency agreement and has an FBI CJIS-assigned ORI and investigative authority and jurisdiction may enter records into NCIC 2000.

3.    Every agency that enters records destined for NCIC 2000 must assure that hit confirmation is available for all records, except III records, 24 hours a day either at that agency or through a written agreement with another agency at its location.

4.    Every agency is responsible for the removal of an NCIC 2000 record as soon as it is aware that the record is no longer valid.

5.    Average message response time for an entry from the CTA to NCIC 2000 and back to the CTA should not exceed 5 seconds.

6.    Average message response time from a CTA to an agency interfaced with the CTA should not exceed 20 seconds after transmission of the entry, with 5 of the 20 seconds allocated to the transmission to, processing by, and return of the response from NCIC 2000 as described in standard 5 above.

7.    Average message response time for an end-user terminal interfaced with a local/regional system which is interfaced with a CTA should not exceed 35 seconds after the transmission of the entry, with 20 of the 35 seconds allocated to the transmission to, processing by, and return of the response from the CTA and NCIC 2000 as described in standards 5 and 6 above.

8.    Average response time from any local/regional system or terminal interfaced directly with the NCIC 2000 computer (i.e., NCIC 2000 lines which terminate at an agency that is not a CTA) to an end-user terminal interfaced with the local/regional system shall not exceed 20 seconds, with 5 of the 20 seconds allocated to the transmission to, processing by, and return of the response from NCIC 2000 as described in standard 5 above.

1. Meet the NCIC 2000 entry criteria for the file involved;

2. Contain at least the minimum data required by NCIC 2000 for entry and up to the maximum number of identifiers permitted in the record by NCIC 2000; and

3. Contain any of the codes or data permitted by NCIC 2000 in each of the fields.

3. Permission to enter a valid record regardless of the existence of any other record(s) already entered in NCIC 2000 by any other agency(s) for the person or property in question.

4. The capability to add information to, delete information from, and/or change information in a field(s) of an existing NCIC 2000 record.

5. The capability to remove a record from file when a record is determined to be invalid, e.g., the warrant which was the basis for an entry is dismissed or when the missing person or property which is the subject of the record is found.

6. The capability to place a locate against another agency's NCIC 2000 record, including records entered by agencies serviced by the same CTA as well as records entered by agencies serviced by another CTA.

The use of the above services by any user agency shall be in accordance with the instructions and procedures contained in the *NCIC 2000 Operating Manual*, the codes contained in the *NCIC 2000 Code Manual*, and new enhancements contained in NCIC 2000 Technical and Operational Updates, CJIS *Information Letter*, or any other official notification from the FBI CJIS Division.

## 5.8    INTRODUCTION TO NCIC 2000 SANCTIONS

1. Purging of an agency's NCIC 2000 records and discontinuance of System access for an agency are the two ultimate sanctions available to FBI CJIS management for enforcement of System policy and procedure. This presumes prosecution for law violations which would normally be handled at the state level and directed toward an individual rather than toward an agency.

Referances to CTAs throughout this report include other agencies with direct NCIC 2000 lines when the inclusion is logical.

2. Considerations

1. An up-to-date FBI CJIS/CTA User Agreement should be on file with the FBI CJIS Division, Programs Support Section, and the respective CTA. It should include reference to the sanctions that could be imposed for failure to comply.

May-24-2007  05:20pm  From-                                    T-176  P.015/015  F-601

*NCIC 2000 STANDARDS AND SANCTIONS*

    2. Inaccuracy
    3  Incompleteness
    4  Unsatisfactory record quality
    5  Unsatisfactory validation
    6  Misuse of system notice of probationary status resulting from audit (30 days to correct deficiencies)
    7. Serious error failure of a CTA to ensure compliance with hit confirmation policy

  2. CTA to terminal agency

    1. Untimeliness
    2. Inaccuracy
    3. Incompleteness
    4. Unsatisfactory record quality
    5. Unsatisfactory validation
    6. Misuse of System
    7 Notice of probationary status resulting from audit (30 days to correct deficiencies)
    8. Serious error
    9 Failure of the terminal agency to comply with hit confirmation policy



4. Letter of intent to remove from System if deficiency not corrected

  1. CJIS APB to CTA head

    1. Continuous serious error trend
    2. Audit failure status (not corrected within 30 days of first letter of request)
    3. Intentional misuse of Purpose Codes in III
    4. Continuous failure of CTA to ensure compliance with hit confirmation policy

  2. CTA to terminal agency

    1. Continuous serious error trend
    2. Audit failure status (not corrected within 30 days of first letter of request)
    3. Misuse of III
    4. Continuous failure of the terminal agency to comply with hit confirmation policy

 5. Advisory letter to state governor

  1. FBI CJIS to governor with copy to CTA