## IN THE UNITED STATES DISRTICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

**ALICIA ALFRED**         :
:
:
Plaintiff,          :
:        **Case No.: 05-CV-1446**
v.          :        (PLF)
:
**DISTRICT OF COLUMBIA, et al.**  :
:
:
Defendants.      :
_____ :

### PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

COMES NOW PLAINTIFF, Alicia Alfred, by and through under signed counsel, Jimmy A. Bell Esq. and the Law Offices of Jimmy A. Bell, P.C. and hereby file this Opposition to Defendant's Motion for Summary Judgment.

As grounds, Plaintiff states the following:

### STATEMENT OF MATERIAL FACTS IN DISPUTE

On the morning of April 25, 2005 Plaintiff walked out of her home in Suitland, Maryland to find that her car had been stolen during the previous night. Exhibit A, Plaintiff's Deposition at 26:11-13.  Plaintiff promptly called the non-emergency number for the Prince George's County Police Department ("PGCPD") and reported her vehicle stolen. Plaintiff's car is registered with and protected under the LoJack Stolen Vehicle Recovery System ("LoJack"). Id. at 26:14-20. LoJack, a nationwide vehicle security operation, equips clients' cars with transmitters that, upon remote activation after a car has been reported stolen to the police, send out a "stolen vehicle"

1

radio signal to nearby police stations and police cars that are equipped to receive the LoJack transmitter signal.

Police department personnel bear the responsibility for changing a vehicle's status to "stolen" after an owner so reports it, and then changing the vehicle's status back to a neutral setting after it has been recovered. Police jurisdictions in the Washington, D.C. metropolitan area have the capability to receive and respond to a LoJack stolen vehicle radio signal, and to update vehicle status in the LoJack system.

After Plaintiff made her report to PGCPD, PGCPD properly and correctly updated the status of Plaintiff's car in the LoJack system to reflect its stolen status. On the night of April 25, 2005 an officer of the MPD phoned Plaintiff to tell her that her car had been located in the District of Columbia and that she could recover it at the location where it was found. Exhibit A at 26:21; 27:1-4.  Plaintiff promptly proceeded to the location given her, arriving about twenty minutes after she received the call. Id. at 27:11-13.  At the recovery site, Plaintiff met and spoke with Officer Fanone. Plaintiff asked Officer Fanone whether she needed to complete any paperwork or make any phone calls to update her car's status in the LoJack system. Id. at 27:14-16.

Officer Fanone assured Plaintiff that she did not need to do anything, and that he would take care of it himself. Id. Plaintiff asked Officer Fanone to explain the procedure he would follow to update her car's status.  Officer Fanone explained the procedure to Plaintiff. Plaintiff asked for Officer Fanone's card, so that she could contact him with any further questions. Id. at 28:1-3.  Officer Fanone provided his card to Plaintiff. Officer Fanone then told Plaintiff she was

"good to go." <u>Id.</u> Officer Fanone neglected to update the status of Plaintiff's car, so that the car was still identified in the LoJack system as a stolen vehicle.

The transmitter in Plaintiff's car continued to send out a "stolen vehicle" radio signal to nearby police stations and patrol cars, because her car was still described in the LoJack system as a stolen vehicle. After leaving the scene of recovery, Plaintiff drove to a Kinko's copy center in the District of Columbia. Shortly after midnight on April 26, 2005 Plaintiff was getting into her car when she was stopped by two MPD officers who asked her about the vehicle because it was still transmitting its "stolen vehicle" signal. <u>Id.</u> at 28:16-21; 29:2-4.  Plaintiff identified herself to these MPD officers as the car's owner, and told them that she had reported it stolen the previous day, and had recovered it only a few hours earlier. <u>Id.</u> Plaintiff handed these officers Officer Fanone's card, which they read. These officers said to Plaintiff, "Oh, Officer Fanone. Oh, OK." <u>Id.</u>

These MPD officers told her that the car was still transmitting a "stolen vehicle" signal. <u>Id.</u>  These MPD officers ran her license tag number through NCIC system and discovered that the NCIC status correctly showed that the car had been found. <u>Id.</u>  They informed Plaintiff of this discovery.  These MPD officers told Plaintiff it might take a few more minutes for her car to fall out of the LoJack system, and that she should be careful on her way home. <u>Id.</u>  Plaintiff drove home.  On the way, she stopped for gas at a station where two MPD patrol cars were also being filled. <u>Id.</u> at 29:5-10. There was no interaction between Plaintiff and any of the officers in charge of these patrol cars. <u>Id.</u>  Although, Defendant should have changed the status of Plaintiff's vehicle to recovered and followed proper procedures to notify NCIC and LoJack of the recovery, Defendant failed to do so. <u>Amended Third Party Complaint</u>, ¶5; <u>LoJack's Motion for Summary</u>

Judgment, Exhibit 1,¶¶8,9; Lojack's Motion at Exhibit 3.  The recovery of Plaintiff's vehicle was not entered into the system, nor was the tracking device in her vehicle was deactivated until April 26, 2005 at 12:31 pm. LoJack's Motion at Exhibit 3.

On the morning of April 26, 2005 Plaintiff drove to the place in Arlington, Virginia where she works for the United States Air Force. Exhibit A at 29:17-19.  Plaintiff was appropriately dressed for work in her blue USAF uniform.  At 11:15 a.m. on April 26, 2005 Plaintiff, still in uniform, walked out of the building where she works to make a car trip for some lunch. Exhibit A at 34:5, 16-20.  As Plaintiff approached her car, she noticed two Arlington County Police Department ("ACPD") patrol cars in the vicinity of her car. Plaintiff unlocked her car and got in, then dialed a friend on her cell phone. Plaintiff started her car, and began to pull away from her parking space. After Plaintiff had driven approximately fifty feet, and while she was still in front of the office building where she works, Plaintiff noticed one of the ACPD patrol cars pull out into the street in front of her, its siren blaring and lights flashing. Exhibit A at 34:5, 16-20.

This ACPD patrol car stopped crosswise in the street, blocking three lanes of traffic and Plaintiff's car. ACPD Officer Mark M. DiGeronimo ("Officer DiGeronimo"), ACPD Badge #1005, got out of this police car with his gun drawn and aimed directly at Plaintiff. Id.  Using his patrol car's loudspeaker, Officer DiGeronimo screamed at Plaintiff to get out of her car with her hands up. Id.  Plaintiff's coworkers on the twelfth floor of the office building where she works heard Officer DiGeronimo's order clearly from the street below. Plaintiff dropped her cell phone and got out of her car, keeping her hands in the air and clearly visible to Officer DiGeronimo at all times. Id. at 3-6.

At this time, Plaintiff noticed that a second ACPD car had pulled up behind Plaintiff's car, with its siren blaring and lights flashing. Officer Robert Giambrone ("Officer Giambrone"), ACPD Badge #660, had emerged from this car and, to assist Officer DiGeronimo, had approached Plaintiff from the rear and was now also pointing his drawn and presumably loaded weapon directly at Plaintiff in an angry and threatening manner and shouting for her to put her hands on the car. Plaintiff immediately informed Officer DiGeronimo that she had reported her car stolen the day before and recovered it the previous night. Id. at 35:1-2.

Plaintiff spread her legs out while keeping her hands on the car.  Plaintiff again tried to explain the theft and recovery incidents of the previous day to Officer DiGeronimo and Officer Giambrone, and that she was the car's registered owner.  Officer DiGeronimo then told Officer Giambrone to handcuff Plaintiff.  At approximately 11:20 a.m., Officer Giambrone handcuffed Plaintiff while she was in her blue military uniform, and in full view of people who work with her in her office building. Id. at 35:19-21.  Plaintiff once again tried to reason with Officer DiGeronimo and Officer Giambrone, telling them again that she was the car's owner, that she herself had reported it stolen, that the MPD had found it the night before, that she had the card of Officer Fanone, who had found the car, and that her ID was there and that they could match it with her registration documents. Id. at 35:9-21.

Officer DiGeronimo began to rummage through Plaintiff's car and bags to find her ID and registration. Officer Giambrone removed Plaintiff's Pentagon ID badge from her USAF uniform. Id. Plaintiff informed Officer Giambrone that her coworkers and supervisors were now gathered on the sidewalk, watching her ordeal. Id. at 36:4-8.  Officer Giambrone asked where

they were.  Plaintiff indicated where on the sidewalk her coworkers and supervisors were standing.

Officer DiGeronimo finally located Plaintiff's car registration. At this time, four more ACPD officers approached to assist with a situation already well under the control of Officer DiGeronimo and Officer Giambrone. Among these four officers were Officer B. Bennett ("Officer Bennett"), ACPD Badge #1307, and Officer W. Rodriguez ("Officer Rodriguez"), ACPD Badge #1219.

As Officer Rodriguez appeared to be the lead officer, Plaintiff pleaded with him, saying the car was hers, she herself had reported it stolen, and that the MPD had found it the night before and she had recovered it. Officer Rodriguez replied that the fact that it was an MPD officer who had found the car would account for the confusion.  Plaintiff pleaded further with the officers on the scene, saying that Officer Fanone's card was in her car.

 Officer Rodriguez replied that MPD officers did this kind of thing all the time, that is, that they often failed to take recovered stolen vehicles out of the LoJack system. Officer Rodriguez stated further that Plaintiff's situation would have to be investigated. Exhibit A at 38:1-3.  Plaintiff continued to plead with Officer Rodriguez, asking what more the officers could need besides her ID and registration, which were now in their possession. Officer Rodriguez requested that Plaintiff "just cooperate" and the situation would be cleared up.

Plaintiff asked Officer DiGeronimo why she was under arrest if she had already proved who she was and that the car was in her name.  Officer DiGeronimo explained that Plaintiff was not "under arrest," but was merely being "detained."  Plaintiff pointed out to Officer DiGeronimo that she was being "detained" in handcuffs.  Officer DiGeronimo explained further that the

possibility existed that the car was jointly owned, for instance, by Plaintiff's husband, and that Plaintiff's husband had reported the car stolen. Plaintiff informed Officer DiGeronimo that she was unmarried, and that she was the car's sole owner. Exhibit A at 37:2-4.

It appeared to Plaintiff at this time that Officer DiGeronimo got frustrated, as he replied that he was only giving Plaintiff one example of what the situation might be. About ten minutes after this, Officer DiGeronimo and Officer Bennett stood beside Plaintiff as her supervisor, Major Cocanour ("Maj. Cocanour"), attempted to approach the scene. Officer DiGeronimo told Maj. Cocanour to back off and remain on the sidewalk. Maj. Cocanour backed off and remained on the sidewalk. Id. at 37:9-12. Plaintiff told Officer DiGeronimo that Maj. Cocanour was her supervisor. Id.

Officer DiGeronimo inquired of Plaintiff what her supervisor's rank might be. Plaintiff informed Officer DiGeronimo that Maj. Cocanour held the rank of Major in the USAF. Officer DiGeronimo replied to Plaintiff, "Oh, that's all," made a dismissive gesture, and then walked over to Maj. Cocanour and spoke with him. Id. at 37:13-17. After speaking with Maj. Cocanour for five minutes, Officer DiGeronimo called for Plaintiff to walk over to where he was standing. Plaintiff walked over to where Officer DiGeronimo was standing, escorted by Officer Bennett. Officer DiGeronimo informed Plaintiff she could wait on the sidewalk.

Plaintiff, still with her hands cuffed tightly behind her back, waited on the sidewalk. After approximately ten minutes, Maj. Cocanour approached Plaintiff to see whether she was all right. Maj. Cocanour informed Plaintiff that he had explained to Officer DiGeronimo that Plaintiff had not come into work on the previous day because her car had been stolen. Id. at 37:16-19. After another fifteen minutes, Maj. Cocanour's supervisor, Colonel Scott Grunwald ("Col. Grunwald")

arrived at the scene.  At this time, Plaintiff noticed that three ACPD officers were in conversation

with Maj. Cocanour and Col. Grunwald, another two ACPD officers were talking on cell phones,

another ACPD officer was directing traffic, another ACPD motorcycle policeman was sitting on

his motorcycle watching, and Officer Bennett was gathering information from Plaintiff. Officer

Bennett requested of Plaintiff her address, home phone number, cell phone number, and Social

Security number.

Plaintiff provided her address, home phone number, and cell phone number to Officer

Bennett, and asked him why he needed to know her Social Security number. Officer Bennett

informed Plaintiff that he needed her Social Security number to write it in a report. After

approximately fifteen minutes, Officer Rodriguez approached Plaintiff and informed her that the

ACPD officers had not been able to contact MPD Officer Fanone. Officer Rodriguez informed

Plaintiff that ACPD officers had been able to verify that Plaintiff's car had been turned over to its

owner the previous night. Officer Rodriguez then, finally, released Plaintiff from the handcuffs

that shackled her wrists tightly behind her back.

Officer DiGeronimo stated to Plaintiff, "If you want to blame someone, blame this guy,"

and waved Officer Fanone's card at Plaintiff. Officer DiGeronimo stated to Plaintiff, "It's his

fault that this happened to you." Exhibit A at 38:11-16.  Plaintiff understood Officer

DiGeronimo's comment as a reference to Officer Fanone. Officer DiGeronimo then offered

Plaintiff his card, asked whether Plaintiff would want him to testify, and informed her that her

car was still identified by the LoJack system as a stolen vehicle. Id. at 17-20.

Plaintiff has a security clearance that is in the process of being upgraded. This clearance

is held high and is limited to only certain Air Force personnel. The upgrade requires an

investigation of Plaintiff's current friends, family and coworkers. Because of this incident, Plaintiff's Director had to send out an email to the entire organization, stressing Plaintiff's innocence the day of the event. Rumors began circulating that day to the effect that Plaintiff was guilt of crimes. Plaintiff's security clearance could be jeopardized by these rumors.

## STATEMENT OF FACTS

On the morning of April 25, 2005 Plaintiff walked out of her home in Suitland, Maryland to find that her car had been stolen during the previous night. Exhibit A, Plaintiff's Deposition at 26:11-13. Plaintiff promptly called the non-emergency number for the Prince George's County Police Department ("PGCPD") and reported her vehicle stolen. Plaintiff's car is registered with and protected under the LoJack Stolen Vehicle Recovery System ("LoJack"). Id. at 26:14-20. LoJack, a nationwide vehicle security operation, equips clients' cars with transmitters that, upon remote activation after a car has been reported stolen to the police, send out a "stolen vehicle" radio signal to nearby police stations and police cars that are equipped to receive the LoJack transmitter signal.

Police department personnel bear the responsibility for changing a vehicle's status to "stolen" after an owner so reports it, and then changing the vehicle's status back to a neutral setting after it has been recovered. Police jurisdictions in the Washington, D.C. metropolitan area have the capability to receive and respond to a LoJack stolen vehicle radio signal, and to update vehicle status in the LoJack system.

After Plaintiff made her report to PGCPD, PGCPD properly and correctly updated the status of Plaintiff's car in the LoJack system to reflect its stolen status. On the night of April 25, 2005 an officer of the MPD phoned Plaintiff to tell her that her car had been located in the

District of Columbia and that she could recover it at the location where it was found. <u>Exhibit A</u> at 26:21; 27:1-4.  Plaintiff promptly proceeded to the location given her, arriving about twenty minutes after she received the call. <u>Id.</u> at 27:11-13.  At the recovery site, Plaintiff met and spoke with Officer Fanone. Plaintiff asked Officer Fanone whether she needed to complete any paperwork or make any phone calls to update her car's status in the LoJack system. <u>Id.</u> at 27:14-16.

Officer Fanone assured Plaintiff that she did not need to do anything, and that he would take care of it himself. <u>Id.</u> Plaintiff asked Officer Fanone to explain the procedure he would follow to update her car's status.  Officer Fanone explained the procedure to Plaintiff. Plaintiff asked for Officer Fanone's card, so that she could contact him with any further questions. <u>Id.</u> at 28:1-3.  Officer Fanone provided his card to Plaintiff. Officer Fanone then told Plaintiff she was "good to go." <u>Id.</u> Officer Fanone neglected to update the status of Plaintiff's car, so that the car was still identified in the LoJack system as a stolen vehicle.

The transmitter in Plaintiff's car continued to send out a "stolen vehicle" radio signal to nearby police stations and patrol cars, because her car was still described in the LoJack system as a stolen vehicle. After leaving the scene of recovery, Plaintiff drove to a Kinko's copy center in the District of Columbia. Shortly after midnight on April 26, 2005 Plaintiff was getting into her car when she was stopped by two MPD officers who asked her about the vehicle because it was still transmitting its "stolen vehicle" signal. <u>Id.</u> at 28:16-21; 29:2-4.  Plaintiff identified herself to these MPD officers as the car's owner, and told them that she had reported it stolen the previous day, and had recovered it only a few hours earlier. <u>Id.</u> Plaintiff handed these officers Officer

Fanone's card, which they read. These officers said to Plaintiff, "Oh, Officer Fanone. Oh, OK."

Id.

These MPD officers told her that the car was still transmitting a "stolen vehicle" signal.

Id. These MPD officers ran her license tag number through NCIC system and discovered that the

NCIC status correctly showed that the car had been found. Id. They informed Plaintiff of this

discovery. These MPD officers told Plaintiff it might take a few more minutes for her car to fall

out of the LoJack system, and that she should be careful on her way home. Id. Plaintiff drove

home. On the way, she stopped for gas at a station where two MPD patrol cars were also being

filled. Id. at 29:5-10. There was no interaction between Plaintiff and any of the officers in charge

of these patrol cars. Id. Although, Defendant should have changed the status of Plaintiff's

vehicle to recovered and followed proper procedures to notify NCIC and LoJack of the recovery,

Defendant failed to do so. Amended Third Party Complaint, ¶5; LoJack's Motion for Summary

Judgment, Exhibit 1,¶¶8,9; Lojack's Motion at Exhibit 3. The recovery of Plaintiff's vehicle was

not entered into the system, nor was the tracking device in her vehicle was deactivated until April

26, 2005 at 12:31 pm. LoJack's Motion at Exhibit 3.

On the morning of April 26, 2005 Plaintiff drove to the place in Arlington, Virginia

where she works for the United States Air Force. Exhibit A at 29:17-19. Plaintiff was

appropriately dressed for work in her blue USAF uniform. At 11:15 a.m. on April 26, 2005

Plaintiff, still in uniform, walked out of the building where she works to make a car trip for some

lunch. Exhibit A at 34:5, 16-20. As Plaintiff approached her car, she noticed two Arlington

County Police Department ("ACPD") patrol cars in the vicinity of her car. Plaintiff unlocked her

car and got in, then dialed a friend on her cell phone. Plaintiff started her car, and began to pull

away from her parking space. After Plaintiff had driven approximately fifty feet, and while she was still in front of the office building where she works, Plaintiff noticed one of the ACPD patrol cars pull out into the street in front of her, its siren blaring and lights flashing. Exhibit A at 34:5, 16-20.

This ACPD patrol car stopped crosswise in the street, blocking three lanes of traffic and Plaintiff's car. ACPD Officer Mark M. DiGeronimo ("Officer DiGeronimo"), ACPD Badge #1005, got out of this police car with his gun drawn and aimed directly at Plaintiff. Id.  Using his patrol car's loudspeaker, Officer DiGeronimo screamed at Plaintiff to get out of her car with her hands up. Id.  Plaintiff's coworkers on the twelfth floor of the office building where she works heard Officer DiGeronimo's order clearly from the street below. Plaintiff dropped her cell phone and got out of her car, keeping her hands in the air and clearly visible to Officer DiGeronimo at all times. Id. at 3-6.

At this time, Plaintiff noticed that a second ACPD car had pulled up behind Plaintiff's car, with its siren blaring and lights flashing. Officer Robert Giambrone ("Officer Giambrone"), ACPD Badge #660, had emerged from this car and, to assist Officer DiGeronimo, had approached Plaintiff from the rear and was now also pointing his drawn and presumably loaded weapon directly at Plaintiff in an angry and threatening manner and shouting for her to put her hands on the car. Plaintiff immediately informed Officer DiGeronimo that she had reported her car stolen the day before and recovered it the previous night. Id. at 35:1-2.

Plaintiff spread her legs out while keeping her hands on the car.  Plaintiff again tried to explain the theft and recovery incidents of the previous day to Officer DiGeronimo and Officer Giambrone, and that she was the car's registered owner.  Officer DiGeronimo then told Officer

12

Giambrone to handcuff Plaintiff.  At approximately 11:20 a.m., Officer Giambrone handcuffed Plaintiff while she was in her blue military uniform, and in full view of people who work with her in her office building. Id. at 35:19-21.  Plaintiff once again tried to reason with Officer DiGeronimo and Officer Giambrone, telling them again that she was the car's owner, that she herself had reported it stolen, that the MPD had found it the night before, that she had the card of Officer Fanone, who had found the car, and that her ID was there and that they could match it with her registration documents. Id. at 35:9-21.

Officer DiGeronimo began to rummage through Plaintiff's car and bags to find her ID and registration. Officer Giambrone removed Plaintiff's Pentagon ID badge from her USAF uniform. Id. Plaintiff informed Officer Giambrone that her coworkers and supervisors were now gathered on the sidewalk, watching her ordeal. Id. at 36:4-8.  Officer Giambrone asked where they were.  Plaintiff indicated where on the sidewalk her coworkers and supervisors were standing.

Officer DiGeronimo finally located Plaintiff's car registration. At this time, four more ACPD officers approached to assist with a situation already well under the control of Officer DiGeronimo and Officer Giambrone. Among these four officers were Officer B. Bennett ("Officer Bennett"), ACPD Badge #1307, and Officer W. Rodriguez ("Officer Rodriguez"), ACPD Badge #1219.

As Officer Rodriguez appeared to be the lead officer, Plaintiff pleaded with him, saying the car was hers, she herself had reported it stolen, and that the MPD had found it the night before and she had recovered it. Officer Rodriguez replied that the fact that it was an MPD

officer who had found the car would account for the confusion.  Plaintiff pleaded further with the officers on the scene, saying that Officer Fanone's card was in her car.

 Officer Rodriguez replied that MPD officers did this kind of thing all the time, that is, that they often failed to take recovered stolen vehicles out of the LoJack system. Officer Rodriguez stated further that Plaintiff's situation would have to be investigated. Exhibit A at 38:1-3.  Plaintiff continued to plead with Officer Rodriguez, asking what more the officers could need besides her ID and registration, which were now in their possession. Officer Rodriguez requested that Plaintiff "just cooperate" and the situation would be cleared up.

Plaintiff asked Officer DiGeronimo why she was under arrest if she had already proved who she was and that the car was in her name.  Officer DiGeronimo explained that Plaintiff was not "under arrest," but was merely being "detained."  Plaintiff pointed out to Officer DiGeronimo that she was being "detained" in handcuffs.  Officer DiGeronimo explained further that the possibility existed that the car was jointly owned, for instance, by Plaintiff's husband, and that Plaintiff's husband had reported the car stolen. Plaintiff informed Officer DiGeronimo that she was unmarried, and that she was the car's sole owner. Exhibit A at 37:2-4.

It appeared to Plaintiff at this time that Officer DiGeronimo got frustrated, as he replied that he was only giving Plaintiff one example of what the situation might be.  About ten minutes after this, Officer DiGeronimo and Officer Bennett stood beside Plaintiff as her supervisor, Major Cocanour ("Maj. Cocanour"), attempted to approach the scene. Officer DiGeronimo told Maj. Cocanour to back off and remain on the sidewalk. Maj. Cocanour backed off and remained on the sidewalk. Id. at 37:9-12. Plaintiff told Officer DiGeronimo that Maj. Cocanour was her supervisor. Id.

Officer DiGeronimo inquired of Plaintiff what her supervisor's rank might be. Plaintiff informed Officer DiGeronimo that Maj. Cocanour held the rank of Major in the USAF. Officer DiGeronimo replied to Plaintiff, "Oh, that's all," made a dismissive gesture, and then walked over to Maj. Cocanour and spoke with him. Id. at 37:13-17.  After speaking with Maj. Cocanour for five minutes, Officer DiGeronimo called for Plaintiff to walk over to where he was standing. Plaintiff walked over to where Officer DiGeronimo was standing, escorted by Officer Bennett. Officer DiGeronimo informed Plaintiff she could wait on the sidewalk.

Plaintiff, still with her hands cuffed tightly behind her back, waited on the sidewalk. After approximately ten minutes, Maj. Cocanour approached Plaintiff to see whether she was all right. Maj. Cocanour informed Plaintiff that he had explained to Officer DiGeronimo that Plaintiff had not come into work on the previous day because her car had been stolen. Id. at 37:16-19.  After another fifteen minutes, Maj. Cocanour's supervisor, Colonel Scott Grunwald ("Col. Grunwald") arrived at the scene.  At this time, Plaintiff noticed that three ACPD officers were in conversation with Maj. Cocanour and Col. Grunwald, another two ACPD officers were talking on cell phones, another ACPD officer was directing traffic, another ACPD motorcycle policeman was sitting on his motorcycle watching, and Officer Bennett was gathering information from Plaintiff. Officer Bennett requested of Plaintiff her address, home phone number, cell phone number, and Social Security number.

Plaintiff provided her address, home phone number, and cell phone number to Officer Bennett, and asked him why he needed to know her Social Security number. Officer Bennett informed Plaintiff that he needed her Social Security number to write it in a report. After approximately fifteen minutes, Officer Rodriguez approached Plaintiff and informed her that the

ACPD officers had not been able to contact MPD Officer Fanone. Officer Rodriguez informed

Plaintiff that ACPD officers had been able to verify that Plaintiff's car had been turned over to its

owner the previous night. Officer Rodriguez then, finally, released Plaintiff from the handcuffs

that shackled her wrists tightly behind her back.

Officer DiGeronimo stated to Plaintiff, "If you want to blame someone, blame this guy,"

and waved Officer Fanone's card at Plaintiff. Officer DiGeronimo stated to Plaintiff, "It's his

fault that this happened to you." Exhibit A at 38:11-16.  Plaintiff understood Officer

DiGeronimo's comment as a reference to Officer Fanone. Officer DiGeronimo then offered

Plaintiff his card, asked whether Plaintiff would want him to testify, and informed her that her

car was still identified by the LoJack system as a stolen vehicle. Id. at 17-20.

Plaintiff has a security clearance that is in the process of being upgraded. This clearance

is held high and is limited to only certain Air Force personnel. The upgrade requires an

investigation of Plaintiff's current friends, family and coworkers. Because of this incident,

Plaintiff's Director had to send out an email to the entire organization, stressing Plaintiff's

innocence the day of the event. Rumors began circulating that day to the effect that Plaintiff was

guilt of crimes. Plaintiff's security clearance could be jeopardized by these rumors.

## ARGUMENT

### I.     STANDARD FOR SUMMARY JUDGMENT

Under Rule 56 of the Federal Rules of Civil Procedure, the Court must grant summary

judgment when no genuine dispute of material fact exists and the moving party is entitled to

judgment as a matter of law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986);

Haavistola v. Community Fire Co. of Rising Sun, Inc., 6 F.3d 211, 214 (4th Cir. 1993); Etefia v.

East Baltimore Comm. Corp., 2 F. Supp.2d 751, 756 (D.Md. 1998). The court is required to

"draw all justifiable inferences in favor of the nonmoving party, including questions of credibility

and of the weight to be accorded particular evidence." Masson v. New Yorker Magazine, 501

U.S. 496, 520 (1991) (citations omitted). Evidence submitted by the non-movant is to be believed

and all justifiable inferences drawn in his or her favor.  In its response to a motion for summary

judgment, the non-moving party must show evidence of specific facts from which the finder of

fact could reasonably return a verdict in his or her favor. Anderson, 477 U.S. at 252; Celotex,

477 at 322-23.  In this way, the opposing party demonstrates that he has discovered admissible

evidence for presentation at trial. Celotex, 477 U.S. at 327. If the opponent fails to establish a

genuine dispute as to a material fact, the moving party is entitled to judgment as a matter of law.

Celotex, 477 U.S. at 323. While the non-moving party must do more than merely raise some

doubt as to the existence of a fact, the moving party ultimately bears the burden of demonstrating

the absence of all genuine issues of material fact. See Matsushita Elec. Indus. Co. v. Zenith

Radio Corp., 475 U.S. 574, 587 (1986).

## II.    THIS COURT MUST DENY DEFENDANTS MOTION FOR SUMMARY JUDGMENT AS MATERIAL FACTS IN DISPUTE EXIST AND PLAINTIFF HAS PRESENTED FACTS SUFFICIENT TO ESTABLISH A PRIMA FACIE CASE OF RACIAL DISCRIMINATION.

In order to plead a claim of racial discrimination under § 1981, a plaintiff must allege that

(1) the plaintiff is a member of a racial minority; (2) the defendant intended to discriminate

against the plaintiff on the basis of race; and (3) the discrimination concerned an activity

enumerated in § 1981. See Mitchell v. DCX, 274 F. Supp. 2d 33, 45 (D.D.C. 2003).   In the

instant case, Plaintiff has established a prima facie case of racial discrimination as Plaintiff: (1) is

an African-American woman; (2) Defendant had an obligation to accurately the report the status

of Plaintiff's vehicle and had a process for reporting the same; and (3) Defendant's failure to

follow said process was based upon Plaintiff's race (African-American).  Specifically, the

Affidavit of Michael Fanone states that when a vehicle is recovered the procedure to be followed

is: "to call teletype by phone at the police station to report the recovery of the vehicle."

Defendant's Motion for Summary Judgment, Exhibit 2 at 2:4.  Although, Defendant should have

changed the status of Plaintiff's vehicle to recovered and followed proper procedures to notify

NCIC and LoJack of the recovery, Defendant failed to do so.  Amended Third Party Complaint,

¶5; LoJack's Motion for Summary Judgment, Exhibit 1 at ¶¶8, 9; Lojack's Motion at Exhibit 3.

The recovery of Plaintiff's vehicle was not entered into the system, nor was the tracking device in

her vehicle was deactivated until April 26, 2005 at 12:31 pm. LoJack's Motion at Exhibit 3.

      According to the sworn deposition testimony of Plaintiff:

```
21        And around 9:00 that night, between 9:00

                    …

 1   and 10:00, I got a call from an Officer Fanone.  He
 2   informed me he had recovered my car and that he had
 3   Ramon Taylor in custody and asked me if I wanted
 4   him arrested.  I told him yes.
 5        He asked me if I gave him permission to
 6   drive the car and I sad no, could I come pick up my
 7   car.
 8        And I said yes or did I want it towed to
 9   the police department, I said no, I will come.
10         I had a girlfriend come and pick me up.
11   We picked, she came by and picked up the car and
12   the officer gave me my keys, I inspected the car
13   and looked at the car.
14         And I said, he gave me my keys, and I said
15   is that it and he said yeah.  I said is it all
16   right for me to drive.  He said yes. Exhibit A at 26:21; 27:1-16
```

Plaintiff went on to explain that:

> 1      That is when he supplied me with his card
> 2   and said that, don't worry, your car is fine, you
> 3   out of the system, you can drive home. Id. at 28:1-3.

After being reassured that Plaintiff's vehicle was accurately listed as "recovered," Plaintiff

explained that:

> We went to Kinko's after because we were
> 5   working on a project.  When I came out of Kinko's,
> 6   two officers drove up beside and asked me was this
> 7   my car.
> 8      Q.  Where was that Kinko's located, in what
> 9   state?
> 10     A.  D.C. off of F Street.
> 11     Q.  These officers were what, with D.C. or
> 12   what type of officers?
> 13     A.  D.C. officers of the same car.
> 14     Q.  Talking about the police officers?
> 15     A.  D.C. police officers, yes.
> 16      Matter of fact, they asked me was this my
> 17   car and I told them yes, sir, yes, I just recovered
> 18   it, I have a card that Officer Fanone gave me and
> 19   and I handed them the card and they looked at it,
> 20   oh, and they said it, his first name, said okay,
> 21   all right, we checked you, looked you up, your car
>
>                          …
>
> 1   has been reported recovered.
> 2      They gave me the card back and said be
> 3   careful on your way home.  I guess it was not out
> 4   of the system, may take a couple of more minutes.
> 5      So I then later stopped at a gas station
> 6   on my way back and there were two officers at the
> 7   gas station and these were off of Pennsylvania
> 8   Avenue, D.C. police officers, but they didn't say
> 9   anything to me, so I assumed I was clear to go and
> 10   thought everything was fine. Id. at 28:4-21; 29:1-10.

Although Plaintiff was assured by Officer Fanone, and the MDP Officers that

subsequently stopped Plaintiff while at Kinko's, that her vehicle had been accurately reported as

"recovered" and that Plaintiff was safe driving her vehicle, Plaintiff testified that:

As I stated earlier, I drove to work at
5  6:30 in the morning, I drove to make sure I was at
6  work at 7:00.

…

1  Q.  At some point, did you come out of the
2  building?
3     A.  At lunch time, I went to lunch.
4     Q.  Approximately what time?
5     A.  11:00, 11:30.
6     Q.  What, you came out to lunch, what
7  happened?
8     A.  I noticed several police officers in the
9  area.
10     Q.  From what jurisdiction?
11     A.  I assume Arlington since I was in
12  Arlington, so I would assume it was Arlington and I
13  got in my car, was talking on my cell phone, got in
14  my car, pulled out into the middle of the road and
15  drove about, I guess, ten meters.
16     And that is when several officers came
17  out, one in front, one in back, both had guns
18  pointed at me, told me to get out of my car.
19     I was dressed in uniform, military blues
20  uniform, they told me put my hands up, get away
21  from the car, step back from the car, hands up.

…

1     I began thinking they must think I took my
2  own car.  I said this is my car.
3     The officers didn't really listen and I
4  was at gun point, I pretty much did what they said,
5  had my hands up, one or the other had his gun on me
6  and they handcuffed me.
7     I told them this is my car, look at my
8  registration.
9     They did not.  At that time, they wasn't
10  really listening, they was really trying to detain
11  or arrest me and they went into my car.  I said you
12  can look for my registration, he was looking in the
13  middle compartment, the registration was in the
14  glove compartment, I said this is not it, it's in
15  the glove compartment not the middle.
16     I tried to show them, gestured, they were
17  back away from the car, straddle your legs, they
18  patted me down.
19     He got the registration, saw the
20  registration was in my name and still insisted on
21  detaining me, arresting me. Id. at 33:4-6; 34-35.

20

After being detained in handcuffs in front of her employer and co-workers for

approximately two hours, Plaintiff was informed that:

> 11  [I]f I want to
> 12  blame someone for the ordeal, I need to blame this
> 13  guy Officer Fanone, the card in their hand, and
> 14  they said he was, he should have taken you out of
> 15  the system when he gave you your car back, this is
> 16  what we expect out of D.C. cops anyway. Id. at 38:11-16.

Although Defendant seems to contend that Plaintiff cannot prevail on her claims of racial

discrimination because Plaintiff does not know the racial identity of the teletype employees,

Plaintiff is not claiming that anyone employed with teletype discriminated against Plaintiff, but

rather that the Caucasian MPD Officers that failed to accurately report the recovery status of

Plaintiff's vehicle did so due to Plaintiff's racial identity, African-American.  Defendant's

motives for their failure to correctly report the recovery status of Plaintiff's vehicle presents a

genuine, material factual dispute that should be resolved by a jury, thus summary judgment is

inappropriate at this time.

Moreover, Once Plaintiff has established a prima facie case, the burden shifts to

Defendant to articulate a legitimate, non-discriminatory reason for its action that, if believed by

the trier of fact, would show that unlawful age discrimination was not the reason for the adverse

action. Id.  Here, the Defendant has failed to bring forth any reasons, legitimate or otherwise for

its failure to accurately report the recovery status of Plaintiff's vehicle as required by Defendant's

own policies and procedures.  Accordingly, this Court must deny Defendant's instant Motion.

### III.    PLAINTIFF'S COMPLAINT DOES NOT INCLUDE ANY ALLEGATIONS REGARDING AN OFFICIAL POLICY AND/OR CUSTOM OF THE DISTRICT RESULTING IN A VIOLATION OF 42 U.S.C. § 1981.

In the instant case, Plaintiff alleged claims of racial discrimination against Defendant as

Plaintiff: (1) is an African-American woman; (2) Defendant had an obligation to accurately the report the status of Plaintiff's vehicle and had a process for reporting the same; and (3) Defendant's failure to follow said process was based upon Plaintiff's race (African-American). See generally, Count II, Plaintiff's Second Amended Complaint. Specifically, the Affidavit of Michael Fanone states that when a vehicle is recovered the procedure to be followed is: "to call teletype by phone at the police station to report the recovery of the vehicle." Defendant's Motion for Summary Judgment, Exhibit 2 at 2:4. Although, Defendant should have changed the status of Plaintiff's vehicle to recovered and followed proper procedures to notify NCIC and LoJack of the recovery, Defendant failed to do so. Amended Third Party Complaint, ¶5; LoJack's Motion for Summary Judgment, Exhibit 1 at ¶¶8, 9; Lojack's Motion at Exhibit 3. The recovery of Plaintiff's vehicle was not entered into the system, nor was the tracking device in her vehicle was deactivated until April 26, 2005 at 12:31 pm. LoJack's Motion at Exhibit 3.

Plaintiff has not made any allegations against Defendant that would even imply that a custom or policy was the cause of the discrimination Plaintiff suffered at the hands of Defendant's employees. In fact, Plaintiff specifically alleged that she was denied equal treatment and security under the laws of the District of Columbia when Defendant's employees failed to follow proper procedure in reporting the recovery status of Plaintiff's vehicle.

### IV. ISSUES OF MATERIAL FACTS EXIST AS TO PLAINTIFF'S CLAIMS OF NEGLIGENCE, THUS SUMMARY JUDGMENT IS INAPPROPRAITE.

In order to prove a claim of negligence, Plaintiff must prove that Defendant owed Plaintiff a duty, Defendant's breached that duty, Plaintiff suffered harm. Scott v. District of

Columbia, 322 U.S. App. D.C. 75 (D.C. Cir. 1996), citing, Toy v. District of Columbia, 549

A.2d 1, 6 (D.C. 1988).   Here, Defendant had a duty to abide by its own policies and procedures

regarding the reporting of the recovery status of Plaintiff's vehicle.  Defendant breached that duty

when at least three MPD Officers failed to accurately report the recovery status of Plaintiff's

vehicle.  As a result of Defendant's failure, Plaintiff was initially stopped by MPD Officers

because Plaintiff's vehicle was still emitting a stolen signal and Plaintiff was subsequently

stopped, held at gun point, and detained in handcuffs for two hours by Arlington Police.

Defendant, in its Motion for Summary Judgment, relies on the Affidavit of Sergeant

Irving Curry to support its contention that Defendant was not negligent in failing to accurately

report the recovery status of Plaintiff's vehicle.  However, Sgt. Curry's affidavit merely details

the procedure Defendant should have followed when reporting the recovery status of Plaintiff's

vehicle, but said affidavit does not state that Defendant followed said procedure in this case. See

generally, Defendant's Motion, Exhibit 5.   In fact, while Sgt. Curry states that Defendant should

have informed the originating agency, in this case Prince George's County, immediately, Exhibit

3, attached to LoJack's Motion for Summary Judgment, demonstrates that Defendant never

contacted anyone to report that Plaintiff's vehicle had been recovered. Compare, Defendant's

Exhibit 5, with, LoJack's Exhibit 3.  Whether or not Defendant in fact accurately reported the

recovery status of Plaintiff's vehicle represents a major factual dispute in the instant case and

must be decided by a jury, making summary judgment inappropriate in the instant case.

Moreover, while Defendant relies on the Affidavit of Officer Fanone in support of its Motion for

Summary Judgment, Officer Fanone's affidavit, with respect to his actions in the instant case

regarding the reporting of the recovery status of Plaintiff's vehicle is defective on it's face.

23

Specifically, while Officer Fanone details the procedure to be followed when reporting the status of a stolen vehicle, Officer Fanone admits that he does not have any personal knowledge upon which to state what he did in Plaintiff's case. See Defendant's Exhibit 2 at 2:4.

Although Plaintiff was assured by Officer Fanone, and the MDP Officers that subsequently stopped Plaintiff while at Kinko's, that her vehicle had been accurately reported as "recovered" and that Plaintiff was safe driving her vehicle, Plaintiff testified that:

> As I stated earlier, I drove to work at
> 5  6:30 in the morning, I drove to make sure I was at
> 6  work at 7:00.
>
>                                             34
> 1  Q.  At some point, did you come out of the
> 2  building?
> 3     A.  At lunch time, I went to lunch.
> 4     Q.  Approximately what time?
> 5     A.  11:00, 11:30.
> 6     Q.  What, you came out to lunch, what
> 7  happened?
> 8     A.  I noticed several police officers in the
> 9  area.
> 10    Q.  From what jurisdiction?
> 11    A.  I assume Arlington since I was in
> 12  Arlington, so I would assume it was Arlington and I
> 13  got in my car, was talking on my cell phone, got in
> 14  my car, pulled out into the middle of the road and
> 15  drove about, I guess, ten meters.
> 16       And that is when several officers came
> 17  out, one in front, one in back, both had guns
> 18  pointed at me, told me to get out of my car.
> 19       I was dressed in uniform, military blues
> 20  uniform, they told me put my hands up, get away
> 21  from the car, step back from the car, hands up.
>
>                                             35
> 1       I began thinking they must think I took my
> 2  own car.  I said this is my car.
> 3       The officers didn't really listen and I
> 4  was at gun point, I pretty much did what they said,
> 5  had my hands up, one or the other had his gun on me
> 6  and they handcuffed me.
> 7       I told them this is my car, look at my
> 8  registration.

<blockquote>
9       They did not.  At that time, they wasn't<br>
10  really listening, they was really trying to detain<br>
11  or arrest me and they went into my car.  I said you<br>
12  can look for my registration, he was looking in the<br>
13  middle compartment, the registration was in the<br>
14  glove compartment, I said this is not it, it's in<br>
15  the glove compartment not the middle.<br>
16      I tried to show them, gestured, they were<br>
17  back away from the car, straddle your legs, they<br>
18  patted me down.<br>
19      He got the registration, saw the<br>
20  registration was in my name and still insisted on<br>
21  detaining me, arresting me. <u>Id.</u> at 33:4-6; 34-35.
</blockquote>

After being detained in handcuffs in front of her employer and co-workers for approximately two hours, Plaintiff was informed that:

<blockquote>
11  [I]f I want to<br>
12  blame someone for the ordeal, I need to blame this<br>
13  guy Officer Fanone, the card in their hand, and<br>
14  they said he was, he should have taken you out of<br>
15  the system when he gave you your car back, this is<br>
16  what we expect out of D.C. cops anyway. <u>Id.</u> at 38:11-16.
</blockquote>

Although, Defendant should have changed the status of Plaintiff's vehicle to recovered and followed proper procedures to notify NCIC and LoJack of the recovery, Defendant failed to do so. <u>Amended Third Party Complaint</u>, ¶5; <u>LoJack's Motion for Summary Judgment, Exhibit 1</u>,¶¶8,9; <u>Lojack's Motion</u> at Exhibit 3.  The recovery of Plaintiff's vehicle was not entered into the system, nor was the tracking device in her vehicle was deactivated until April 26, 2005 at 12:31 pm. <u>LoJack's Motion</u> at Exhibit 3.  Because Defendant admittedly had a duty to accurately report the recovery status of Plaintiff's vehicle, Defendant breached this duty by failing to accurately report said recovery status, and Plaintiff suffered harm in that she was stopped twice and ultimately detained, at gun point and in handcuffs for two hours by the Arlington Police in front of her employer and co-workers, genuine issues of material fact exist as to Plaintiff's claims

of negligence and this Court must deny Defendant's Motion for Summary Judgment.  Moreover,

Defendant's allegation of contributory negligence on the part of Plaintiff does nothing but add to

the factual disputes in this case and presents yet another question which must be resolved by a

jury, further making summary judgment inappropriate in the instant case.

**V.      SUMMARY JUDGMENT IS INAPPROPRIATE AS TO PLAINTIFF'S FEDERAL CLAIMS, THUS THIS COURT RETAINS PENDANT JURISDICTION AS TO PLAINTIFF'S STATE CLAIMS.**

Because summary judgment must be denied as to Plaintiff's claims of racial

discrimination according to 42 U.S. § 1981, this Court retains pendant jurisdiction over

Plaintiff's state claims and Defendant's instant Motion must be denied.


Respectfully submitted,


_____/s/_____
Jimmy A. Bell, Esq.
Law Office of Jimmy A. Bell, P.C.
9610 Marlboro Pike
Upper Marlboro, MD 20772
(301) 599-7620
(301) 599-7623 (Fax)
Counsel for Plaintiff
Bar No. MD 14639


Dated: October 12, 2007