```
                                1
 1  UNITED STATES DISTRICT COURT
 2        FOR THE DISTRICT OF COLUMBIA
 3  ---------------------------------x
 4  ALICIA Y. ALFRED,            x
 5        Plaintiff,      x  1:05
 6        v.            x  CV 01446 PLF
 7  DISTRICT OF COLUMBIA and       x
 8  THE LOJACK COMPANY, et al.,    x
 9        Defendants.     x
10  ---------------------------------x
11              Wednesday, August 29, 2007
                 Washington, D.C.
12
13  The deposition of ALICIA YOLANDA ALFRED called for
14  examination by counsel for Defendants in the
15  above-titled matter, pursuant to notice, in the
16  Offices of the Attorney General for the District of
17  Columbia, 441 Fourth Street, Northwest, Washington,
18  D.C., before Jonell Easton, notary public in and
19  for the District of Columbia, at 10:45 a.m., when
20  were present on behalf of respective parties:
21

                                2
 1  On behalf of the Defendant District of Columbia:
 2       URENTHEA MCQUINN, ESQUIRE
 3       Assistant Attorney General
 4       Office of the Attorney General
 5       441 Fourth Street, Northwest
 6       Washington, D.C.  20001
 7       202.724.6646
 8
 9
10  On behalf of the Defendant LoJack Company:
11       WARREN D. STEPHENS, ESQUIRE
12       DeCaro, Doran, Siciliano,
13         Gallagher & DeBlasis, LLP
14       4601 Forbes Boulevard
15       Suite 200
16       Lanham, Maryland  20703-0040
17       301.306.4300
18
19
20
21
```

3
1   On behalf of the Plaintiff:
2        JIMMY A. BELL, ESQUIRE
3        Law Office of Jimmy A. Bell, P.C.
4        9601 Marlboro Pike
5        Upper Marlboro, Maryland  20772
6        301.599.7620
7
8
9
10
11
12
13
14
15


26
7   Q.  On April 25, 2005, you stated in your
8   complaint that you got up that morning and found
9   out your car was stolen.  Tell us the details, what
10  happened on that morning.
11      A.  I woke up to go to work and my car was not
12  there and I tried to figure out what happened with
13  my car.
14          A few hours later, I went ahead and
15  reported it stolen and called the Prince George's
16  County police and they reported it stolen and
17  notified, I had LoJack, and they said they would,
18  once your car is reported stolen, the LoJack
19  automatically, you know, was turned on through the
20  NCIC system or something of that reference.
21          And around 9:00 that night, between 9:00

27
1   and 10:00, I got a call from an Officer Fanone.  He
2   informed me he had recovered my car and that he had
3   Ramon Taylor in custody and asked me if I wanted
4   him arrested.  I told him yes.
5           He asked me if I gave him permission to
6   drive the car and I sad no, could I come pick up my
7   car.
8           And I said yes or did I want it towed to
9   the police department, I said no, I will come.

10      I had a girlfriend come and pick me up.
11  We picked, she came by and picked up the car and
12  the officer gave me my keys, I inspected the car
13  and looked at the car.
14      And I said, he gave me my keys, and I said
15  is that it and he said yeah. I said is it all
16  right for me to drive. He said yes.
17    Q. Can I stop you, the officer we are talking
18  about is Michael Fanone?
19    A. I'm sorry, Officer Fanone, and that is
20  when my girlfriend asked for his card, do you have
21  a card in case we have questions.

                            28

1      That is when he supplied me with his card
2  and said that, don't worry, your car is fine, you
3  out of the system, you can drive home.
4      We went to Kinko's after because we were
5  working on a project. When I came out of Kinko's,
6  two officers drove up beside and asked me was this
7  my car.
8    Q. Where was that Kinko's located, in what
9  state?
10    A. D.C. off of F Street.
11    Q. These officers were what, with D.C. or
12  what type of officers?
13    A. D.C. officers of the same car.
14    Q. Talking about the police officers?
15    A. D.C. police officers, yes.
16      Matter of fact, they asked me was this my
17  car and I told them yes, sir, yes, I just recovered
18  it, I have a card that Officer Fanone gave me and
19  and I handed them the card and they looked at it,
20  oh, and they said it, his first name, said okay,
21  all right, we checked you, looked you up, your car

                            29

1  has been reported recovered.
2      They gave me the card back and said be
3  careful on your way home. I guess it was not out
4  of the system, may take a couple of more minutes.
5      So I then later stopped at a gas station
6  on my way back and there were two officers at the
7  gas station and these were off of Pennsylvania
8  Avenue, D.C. police officers, but they didn't say
9  anything to me, so I assumed I was clear to go and

10  thought everything was fine.
11      Then I got up the next morning and that is
12  when I went to work and then ---
13    Q.  Now talking about April 26, 2005?
14    A.  Right, actually, when the two D.C. cops
15  stopped me, asked me if it was my car, it was
16  midnight April 26.
17      So yeah, April 26, around 6:30, I got up
18  to go work at 7:00 and then that is when I parked
19  right in front of building.
20    Q.  You drove to work in the same previously
21  stolen car?

                            30

1    A.  Right, I only have one car, so it would be
2  the same car.
3    Q.  Is there a reason you didn't call anybody
4  after you had been told you were still emitting a
5  signal?
6    A.  Reason is they reassured me, said it
7  emitted a signal, but it should be out of the
8  system in a couple of minutes.
9      Had I known, I would not have driven my
10  car, especially to Virginia.
11    Q.  Did you check that morning, call any
12  place?
13    A.  As I stated before, because I stopped at
14  the gas station, two cops were there, they didn't
15  stop or say anything about a stolen car signal
16  coming to them, then, at that time, that told me
17  well, maybe the system, maybe I am out of system.
18    Q.  I want to ask you one more time.
19      Before you left the house, did you make
20  any calls to check to see if you were still
21  emitting a signal?

                            31

1    A.  Before I left?  Officer Fanone, he --- I
2  checked with him to reassure me it was out of the
3  system and he told me, yes.
4      For me to go behind him and check --- and
5  who would I have checked with, I had no idea
6  because you call it in to the cops, I recovered it
7  from the cops, a D.C. police officer tells me it is
8  out of the system, that is what --- I took his
9  word.

10       He told me it was out.  I took it that it
11  was out of the system.  I had no idea it was my
12  responsibility to go behind a police officer, do
13  his job and check to make sure the system, I was
14  out of the system.
15       I didn't put myself in the system.  I
16  can't take myself out, I didn't call --- I called
17  the cops, law enforcement, I am automatically
18  entered, they told me I was automatically taken out
19  once it was recovered, so, no, there was no one for
20  me to call.
21    Q.  You did not call the police?

32
1    A.  Why?
2    Q.  Don't ask me questions.
3       You didn't call the police?
4    A.  I asked the police, yes.
5    Q.  The morning before you left the house?
6    A.  I asked the police when they recovered the
7  car.  I did not again call or contact more police
8  officials to verify that the first police officer
9  was telling me the truth.
10    Q.  The morning before you left, you did not
11  call the police?
12    A.  No, I never called the police after I
13  recovered my car.
14    Q.  The morning before you left the house, did
15  you call LoJack?
16    A.  No.
17    Q.  Ever?
18    A.  I did not call LoJack to put myself in the
19  system --- actually I called LoJack two days after
20  the incident.  LoJack said they cannot remove me
21  out of the system, it was no need to call LoJack,

33
1  they could not remove me out of system.
2    Q.  You got in the car and drove where that
3  morning?
4    A.  As I stated earlier, I drove to work at
5  6:30 in the morning, I drove to make sure I was at
6  work at 7:00.

34
1  Q.  At some point, did you come out of the

2  building?
3    A.  At lunch time, I went to lunch.
4    Q.  Approximately what time?
5    A.  11:00, 11:30.
6    Q.  What, you came out to lunch, what
7  happened?
8    A.  I noticed several police officers in the
9  area.
10   Q.  From what jurisdiction?
11   A.  I assume Arlington since I was in
12 Arlington, so I would assume it was Arlington and I
13 got in my car, was talking on my cell phone, got in
14 my car, pulled out into the middle of the road and
15 drove about, I guess, ten meters.
16      And that is when several officers came
17 out, one in front, one in back, both had guns
18 pointed at me, told me to get out of my car.
19      I was dressed in uniform, military blues
20 uniform, they told me put my hands up, get away
21 from the car, step back from the car, hands up.

                                35
1       I began thinking they must think I took my
2  own car.  I said this is my car.
3       The officers didn't really listen and I
4  was at gun point, I pretty much did what they said,
5  had my hands up, one or the other had his gun on me
6  and they handcuffed me.
7       I told them this is my car, look at my
8  registration.
9       They did not.  At that time, they wasn't
10 really listening, they was really trying to detain
11 or arrest me and they went into my car.  I said you
12 can look for my registration, he was looking in the
13 middle compartment, the registration was in the
14 glove compartment, I said this is not it, it's in
15 the glove compartment not the middle.
16      I tried to show them, gestured, they were
17 back away from the car, straddle your legs, they
18 patted me down.
19      He got the registration, saw the
20 registration was in my name and still insisted on
21 detaining me, arresting me.

                                36
1       By that time because it was lunch, the

2  street was filled with my co workers and people
3  from other buildings.
4      I asked them please can we not do this
5  right here in front of my office. I was pretty
6  much begging because I was embarrassed.
7      My supervisor came down, everybody knows
8  my car, they would not allow him to ---
9   Q.  Who?
10  A.  My supervisor.
11  Q.  What is the name?
12  A.  Major Niles Cocanour, he was told get back
13  on the sidewalk.
14      By that time, they told me, pretty much
15  pulled me over into, pulled me further down the
16  street to the squad car, told me sit down in the
17  car, I refused because it was uncomfortable with my
18  hands cuffed behind my back.
19      At that time, I began to reason --- if the
20  registration is in my name, you have my
21  identification, I had a military, Pentagon badge on

37
1  my shirt.
2      The reason was it could be my husband's
3  car. I told them there was one name on the
4  registration, he got upset.
5      I am giving an example what could have
6  happened and then, by this time, my supervisor,
7  boss came down and was trying to reason with the
8  cops.
9      They told everybody again stand to the
10  curb and then I tried, at least talk to my boss, he
11  will explain because I called out the day before, I
12  couldn't get to work, he knew my car was stolen.
13      He went over to talk to my boss and then
14  they allowed me to come on the sidewalk, still
15  handcuffed.
16      My boss told me, I told them you had
17  called out because your car was stolen. I guess he
18  understood it, so that I also gave him the card
19  from Fanone, I gave them his card.
20      They tried to contact him, could not reach
21  him, could not contact him.

38
1      The officers said they had to investigate

2  before they released me to verify before it was
3  resolved.
4     Q.  Approximately how long did the Arlington
5  police officers detain you?
6     A.  Over an hour.
7     Q.  This started at approximately 11:00 and it
8  was after 12:00 when they finished?
9     A.  Yes, almost two hours actually, yes.
10    Q.  When it ended, what had they ascertained?
11    A.  They ascertained, quote, if I want to
12 blame someone for the ordeal, I need to blame this
13 guy Officer Fanone, the card in their hand, and
14 they said he was, he should have taken you out of
15 the system when he gave you your car back, this is
16 what we expect out of D.C. cops anyway.
17        That was pretty much what he said and
18 stated that if I needed them to verify or vouch for
19 what happened, what went down, they gave me their
20 badge numbers and their identification to state my
21 car was still listed as stolen in the system.

39
1     Q.  Which officers held the guns on you ---
2  D.C. or Arlington?
3     A.  Which officers held guns --- the Arlington
4  officers arrested me.
5     Q.  Which officers detained you from 11:00 to
6  12:00, D.C. or Arlington?
7     A.  11:00 or 12:00, I was in Arlington, 26
8  April.
9     Q.  The officers were Arlington officers?
10    A.  Yes.

49
6  Q.  I am looking at page 3 of your answers to
7  interrogatories, the paragraph in the middle of the
8  page because of Officer Fanone's negligence, what
9  is negligence?
10    A.  Do you want me to define the word?
11    Q.  Did you provide an answer?
12    A.  It is military, okay.
13    Q.  I need you to listen.
14    A.  Okay, can I have a moment.
15    Q.  The question is --
16    A.  I understand the question.
17       Officer Fanone failed to do his job.  He

18  was negligent because of what he did not do.  He
19  did not call in, I asked him specifically am I okay
20  to drive, am I okay, I am a woman in a Jaguar,
21  driving in Virginia, the car is listed as stolen.

                                50
1        Because he did not do his job I am
2   handcuffed in front of my job and arrested.
3        You are asking me to define negligence, he
4   failed to do his job, failed to put it in the
5   system, it didn't take but a five-minute phone
6   call.
7        Arlington waited, I had to wait 20 minutes
8   for them to make sure, they contacted someone
9   somewhere until they were sure it was out of the
10  system.  He failed to do that.

                                56
5   Q.  What is your understanding of how the
6   LoJack system works, how was it explained to you?
7      A.  It was explained to me on 25 of April that
8   once I reported the car stolen, police officers
9   would input it into NCIC system.
10       Once it was inputted into that and it was
11  transmitted or has been initiated, it will initiate
12  a signal to the police car it was a stolen vehicle.
13       When the car is recovered, the police
14  department or police agency or anything, federal
15  agency, not just the police, any law enforcement
16  agency can go in and turn the system, turn it off
17  out of NCIC.

                                59
12  Q.  Tell me how did the incident affect you at
13  your job?
14    A.  The rumors started spreading about I had
15  done some type of illegal action or some type of
16  illegal affiliation to get my car or something or I
17  was being arrested and I was humiliated,
18  embarrassed by the fact that my leadership had to
19  send out two emails to calm everything down, calm
20  the rumors down, and it was just degrading, the
21  experience was very degrading.

                                60
1    Q.  Is that part of your damages that you are

2  seeking?
3     A.  Yes.
4        MR. BELL:  I have nothing further.
5      EXAMINATION BY COUNSEL FOR DEFENDANTS
6        BY MS. MCQUINN:
7     Q.  The emails that were sent by your office
8  were sent about Arlington police officers holding
9  you outside of your building?
10    A.  I see it as it was a result of one officer
11  not reporting my car being recovered, had my car
12  been reported as recovered, nothing would have
13  happened on April 26.
14    Q.  Did Officer Fanone hold a gun on you any
15  time?
16    A.  Officer Fanone did something worse, he let
17  me drive around D.C. and Virginia in a stolen
18  vehicle, it was worse to me, because of that I
19  could have been killed, I could have been killed.
20    Q.  Weren't you told you were still emitting
21  the signal?

                                    61
1     A.  I was told afterwards I was still emitting
2  a signal, but it should be gone away shortly.